# In the United States Court of Federal Claims

No. 08-660C
Filed: December 15, 2008[*]
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | Administrative Dispute Resolution Act of |
| | * | 1996, Pub. L. No. 104-320 §§ 12(a)(b) |
| | * | 110 Stat. 3870 (1996), codified at |
| WACKENHUT SERVICES, INC., | * | 28 U.S.C. § 1491(b); |
| | * | Administrative Procedure Act, |
| Plaintiff, | * | 5 U.S.C. § 706; |
| | * | Competition on Contracting Act, |
| v. | * | 31 U.S.C. § 3551(2)(A); |
| | * | Doctrine of Laches; |
| THE UNITED STATES, | * | Federal Acquisition Regulation 15.101, |
| | * | 15.3, 15.303(a)(b), 15.305(a)(2), |
| Defendant, | * | 15.306(d)(2), 15.306(e)(1)-(5), 15.308, |
| | * | 15.304(c)(3)(i), NFS 1815.3, |
| and | * | 11852.216-83; |
| | * | Fed. R. Ev. 702; |
| COASTAL INTERNATIONAL SECURITY, | * | Intervenor, RCFC 24(a); |
| | * | Judgment on the Administrative Record, |
| Defendant-Intervenor. | * | RCFC 52.1; |
| | * | Post-Award Bid Protest; |
| | * | Standing; |
| | * | RCFC 7(b)(1). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Richard J. Webber**, Arent Fox, LLP, Washington, D.C., Counsel for Plaintiff.

**Richard Paul Schroeder**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Vincent Salgado and Amber M. Hufft**, Office of the General Counsel, National Aeronautics and Space Administration, Of Counsel for Defendant.

---

[*] On December 11, 2008, a pre-publication draft of this Memorandum Opinion and Final Order was provided under seal to the parties. The parties were instructed to propose any redactions on or before the start of business on December 15, 2008. On December 15, 2008, this Memorandum Opinion and Final Order was published with redactions, indicated by the designation "[deleted]." A non-redacted version also was filed under seal on that date with the Clerk of the United States Court of Federal Claims.

**Anthony Hotchkiss Anikeeff**, Bracewell & Giuliani, LLP, Washington, D.C., Counsel for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER

On September 17, 2008 a post-award bid protest challenge to the National Aeronautics and Space Administration ("NASA")'s May 20, 2008 award of a $1.186 billion contract, that may be increased to $1.62 billion, for "protection services," *i.e.*, security guard services, potential fire fighting/prevention services, and potential emergency medical response services, at fourteen different NASA locations across the United States, was filed in the United States Court of Federal Claims. *See* AR at 26421, 26638. For the reasons discussed herein, the court has determined that this contract award should be set aside and that NASA appoint a re-constructed Source Selection Board to: re-evaluate specific sections of the proposals of Wackenhut Services, Inc. and Coastal International Security; and appoint a new Source Selection Authority to determine which proposal provides the "best value" to the Government.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

* * *

**I.      RELEVANT FACTS.**

       **A.      The Solicitation.**

       **B.      The Source Evaluation Boards Duties.**

             **1.      Evaluation Of The "Mission Suitability" Factor.**

             **2.      Evaluation Of The "Past Performance" Factor.**

             **3.      Evaluation Of The "Price" Factor.**

       **C.      The Source Evaluation Board's Initial Evaluations.**

       **D.      The Source Evaluation Board's Final Determinations.**

             **1.      The "Mission Suitability" Factor.**

                    **a.      The "Technical Approach" Subfactor.**

                    **b.      The "Management Approach" Subfactor.**

2

2.      The "Past Performance" Factor.

3.      The "Price" Factor.

4.      Comparison Of Preliminary And Final Score Evaluation Ratings And Scores.

E.      The Source Selection Authority's Evaluation And Award.

II.     PROCEDURAL HISTORY.

A.      At The General Accounting Office.

B.      At The United States Court Of Federal Claims.

III.    JURISDICTION.

A.      Jurisdiction.

B.      Standing.

1.      The Plaintiff Has Standing.

a.      As An "Interested Party."

b.      Having Demonstrated A "Substantial Chance" of Being Awarded The Contract.

2.      The Intervenor Has Standing.

a.      The Intervenor's Motion Was Timely.

b.      The Intervenor Has An Interest Relating To The Transaction At Issue.

c.      The Intervenor's Interest Cannot Adequately Be Represented By The Parties.

IV.     THE GOVERNMENT'S LACHES DEFENSE.

A.      The Government's Argument.

B.      The Plaintiff's Response.

3

     **C.**     **The Court's Resolution.**

**V.**     **GOVERNING PRECEDENT REGARDING A DECISION ON THE ADMINISTRATIVE RECORD IN A BID PROTEST CASE.**

**VI.**     **DECISIONS CONTESTED IN THIS BID PROTEST.**

     **A.**     **Decisions By The Source Evaluation Board.**

          **1.**     **The "Mission Suitability" Factor Determinations.**

               **a.**     **The Qualitative Significance Of The Ratings.**

                    **i.**     **The Plaintiff's Argument.**

                    **ii.**     **The Government's Response.**

                    **iii.**     **The Intervenor's Response.**

                    **iv.**     **The Court's Resolution.**

               **b.**     **The Rating And Scoring Of The "Technical Approach" Subfactor.**

                    **i.**     **The Plaintiff's Argument.**

                    **ii.**     **The Government's Response.**

                    **iii.**     **The Intervenor's Response.**

                    **iv.**     **The Court's Resolution.**

               **c.**     **The Scoring And Rating Of The "Management Approach" Subfactor.**

                    **i.**     **The Plaintiff's Argument.**

                    **ii.**     **The Government's Response.**

                    **iii.**     **The Intervenor's Response.**

                    **iv.**     **The Court's Resolution.**

4

  2.  The "Past Performance" Factor Determination.

    a.  The Plaintiff's Argument.

    b.  The Government's Response.

    c.  The Intervenor's Response.

    d.  The Court's Resolution.

 B.  The Decisions Of The Source Selection Authority.

  1.  The "Mission Suitability" Factor Determination.

    a.  The Plaintiff's Argument.

    b.  The Government's Response.

    c.  The Intervenor's Response.

    d.  The Court's Resolution.

  2.  The "Past Performance" Factor Determination.

    a.  The Plaintiff's Argument.

    b.  The Government Response.

    c.  The Intervenor's Response.

    d.  The Court's Resolution.

  3.  The "Price" Factor Determination.

VII. PLAINTIFF HAS ESTABLISHED PREJUDICE.

VIII. PLAINTIFF IS ENTITLED TO LIMITED INJUNCTIVE RELIEF.

 A.  Governing Precedent Regarding Relief In Bid Protest Cases.

 B.  The Relief Requested In This Case.

 C.  The Court's Resolution.

  **1.**  **Plaintiff Has Demonstrated Success On The Merits Regarding Specific Issues.**

  **2.**  **Plaintiff Has Established Irreparable Harm, If The Court Does Not Grant Injunctive Relief.**

  **3.**  **In This Case, A Balance Of Hardships To The Parties Favors The Grant Of Limited Injunctive Relief.**

  **4.**  **In This Case, The Public Interest Weighs in Favor of Limited Injunctive Relief.**

**IX.** **CONCLUSION.**

*  *  *

**I.** **RELEVANT FACTS.**

  **A.** **The Solicitation.**

On September 14, 2007, NASA issued a 2,600 page Final Request for Proposal No. NNX077040R (hereinafter "RFP" or "Solicitation"), to consolidate protective and responsive services to:

> ensure efficient and standard services and policies; provide for viable and integrated measures to mitigate security threats against personnel, assets, resources and technology; and provide response capabilities to man-made and natural emergencies. The NPSC [NASA Protective Services Contract] includes the following services: 1. Security Services: . . . .; 2. Emergency Management: . . . .; 3. Fire Services: . . . .; 4. Export Control: . . . .; 5. Information Assurance[.]

AR at 26638.

Security services (72.7%); fire fighting/prevention (22.4%); and emergency medical response (2.7%), comprised approximately 98% of the total value of the Solicitation. *Id*. at 2626-28.

The Scope of Work required that each offeror provide a firm fixed-price contract with separately priced task orders for each of the identified fourteen locations. *Id*. at 9-10. Task orders were to be issued to each offeror pursuant to the final contract. *Id*. at 10. NASA, however, also reserved the right to issue additional task orders not to exceed 20% of the total fixed price. *Id*. at 12. The base period for the contract was five years, with five one-year options. *Id*. at 10.

**B.      The Source Evaluation Boards Duties.**

The Solicitation required proposals to be evaluated by a Source Evaluation Board ("SEB"), pursuant to: the Federal Acquisition Regulation ("FAR") 15.3 ("Source Selection"); the NASA FAR Supplement (NFS 1815.3); and the requirements of the RFP.  *See* AR at 2603.  The SEB was required to follow the procedure at NFS 1815.370 and report its findings to a Source Selection Authority ("SSA") who would be responsible for the Final Source Selection Decision.  *Id*. at 2604.

The SEB was required to conduct an evaluation of the following factors and subfactor elements:

Factor 1: Mission Suitability

    Subfactor 1: Technical Approach
           Understanding the Requirements
           Staffing Plan
           Innovation and Efficiency

    Subfactor 2: Management Approach
           Management Plan
           Phase-In Plan
           Key Personnel
           Risk Management

    Subfactor 3: Small Business Participation Approach
           Small Business Subcontracting
           Small Disadvantaged Business Participation

    Subfactor 4: Safety and Health Approach

Factor 2: Past Performance

Factor 3: Price

*Id*. at 1473-82.

"Mission Suitability" was the only factor to be weighed and numerically scored.  *Id*. at 1473. This factor also was stated to be more important than the "Past Performance" Factor, however, the

"Mission Suitability" and "Past Performance" Factors, when combined, were "significantly more important than the Price [F]actor." *Id*. at 1483.[1]

The Solicitation, however, provided that this procurement was a "competitive negotiated acquisition." *Id*. at 1472. Accordingly, the contract was to be awarded to the "responsible Offeror whose proposal results in the best value to the Government." *Id*. The evaluation methodology is set forth in both the Solicitation and subsequent Source Evaluation Plan. *Id*. at 2603-19.

### 1. Evaluation Of The "Mission Suitability" Factor.

The "Mission Suitability" Factor included four subfactors:

Factor 1: Mission Suitability

> Technical Approach (425 Points)
> > TA1 – Understanding the Requirements
> > TA2 – Staffing Plan
> > TA3 – Innovation and Efficiency
>
> Management Approach (375 Points)
> > MA1 – Management Plan
> > MA2 – Phase-in Plan
> > MA3 – Key Personnel
> > MA4 – Risk Management
>
> Small Business Participation Approach (100 Points)
> > SB1 – Small Business Subcontracting
> > SB2 – Small Disadvantaged Business Participation

---

[1] FAR 15.101 provides:

An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches. In different types of acquisitions, the relative importance of cost or price may vary. . . . The less definitive the requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations may play a dominant role in source selection.

48 C.F.R. § 15.101.

Safety and Health Approach (100 Points)
Safety & Health Plan, Safety Record/History

*Id*. at 12566-67.

The "Mission Suitability" Factor evaluation was to proceed in three stages.  First, the SEB was required to reach a consensus recommendation of each proposal's "significant strengths," "regular strengths," "regular weaknesses," and "significant weaknesses."  *Id*. at 2611.

Second, the SEB was required to assign an adjectival rating for each subfactor, based on assessed strengths and weaknesses.  *Id*.  The adjectival ratings are set forth below, together with assigned definitions and percentile ratings:

| Adjective Rating | Definitions | Percentile Range |
|---|---|---|
| Excellent | A comprehensive and thorough proposal of exceptional merit with one or more significant strengths. No deficiency or significant weakness exists. | 91-100 |
| Very Good | A proposal having no deficiency and which demonstrates overall competence. One or more significant strengths have been found, and strengths out balance any weaknesses that exist. | 71-90 |
| Good | A proposal having no deficiency and which shows a reasonably sound response. There may be strengths or weaknesses, or both. As a whole, weaknesses not offset by strengths do not significantly detract from the offeror's response. | 51-70 |
| Fair | A proposal having no deficiency and which has one or more weaknesses.  Weaknesses outbalance any strengths. | 31-50 |
| Poor | A proposal that has one or more deficiencies or significant weaknesses that demonstrate a lack of overall competence or would require a major proposal revision to correct. | 0-30 |

*Id*. at 2609.

9

Third, the SEB was required to assign a percentage score for the designated adjectival rating for each subfactor.  *Id*. at 2611.  That percentage score, when multiplied by the number of available points for each subfactor, yielded the total score for the subfactor.  *Id*. at 12569-73.

The number of available points for each subfactor of the "Mission Suitability" Factor is listed below:

| Technical Approach | 425 |
| --- | --- |
| Management Approach | 375 |
| Small Business Participation Approach | 100 |
| Safety & Health Approach | 100 |
| Total | 1,000 |

*Id*. at 1473.

### 2.    Evaluation Of The "Past Performance" Factor.

To satisfy the "Past Performance" Factor, offerors were required to provide references for at least five current contracts or any contracts completed in the past three years, "with special emphasis on the experience that is relevant to this effort."  AR at 1437.  In addition, offerors were advised to describe their past performance and experience, as well as overall accomplishments for each of these contracts.  *Id*.  "Past Performance" questionnaires were sent to at least three of the contract references.  *Id*.  Information regarding the major subcontractors also was to be considered. *Id*.

The SEB was required to evaluate an offeror's past performance, in accordance with Section M of the Solicitation as follows:

a.      Overall Past Performance

b.      Relevant Experience for the Prime and Major Subcontractors[]

c.      Small Business Participation

d.      Safety and Health

The evaluation of past performance will consider data provided by Offerors and data obtained from other sources such as the Past Performance Questionnaire, which was an attachment to the RFP.  Additionally, the SEB's evaluation will consider any other Past Performance information obtained independently by the Past Performance

Committee, including data extracted using the Past Performance data base (PPDB). . . . For each proposal, the SEB will identify findings, if any, for past performance from the data gathered by the SEB Past Performance Committee and consider these findings when assigning an adjective rating.

*Id*. at 2611.

Unlike the "Mission Suitability" Factor, the "Past Performance" Factor was not numerically scored, but assigned only an adjective rating. *Id*. The adjective rating definitions were:

Excellent: Of exceptional merit; exemplary performance in a timely, efficient, and economical manner; very minor (if any) problems with no adverse effect on overall performance; and experience that is highly relevant to this procurement[.]

Very Good: Very effective performance; fully responsive to contract requirements; contract requirements accomplished in a timely, efficient, and economical manner for the most part; only minor problems with little identifiable effect on overall performance; and experience is very relevant to this procurement[.]

Good: Effective performance; fully responsive to contract requirements; reportable problems, but with little identifiable effect on overall performance; and experience is relevant to this procurement[.]

Fair: Meets or slightly exceeds minimum acceptable standards; adequate results, reportable problems with identifiable but not substantial, effects on overall performance; and experience is at least somewhat relevant to this procurement.

Poor: Does not meet minimum acceptable standards in one or more areas; action required in one or more areas; problems in one or more areas, which adversely affect overall performance.

Neutral: In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance [see FAR 15.305(a)(2)(ii) and (iv)].

*Id*. at 2612.

### 3.    Evaluation Of The "Price" Factor.

Finally, the SEB was required to evaluate the "Price" Factor, considering the total proposed fixed price for the five-year base period and the combined subsequent option periods. *See* AR at 2613.

11

C.    **The Source Evaluation Board's Initial Evaluations.**

Five offerors submitted initial proposals in response to the September 14, 2007 Solicitation: Coastal International Security, Inc. ("CIS");[2] OMNISEC Protective Services, LLC ("OMNISEC");[3] Protective Services Alliance, LLC;[4] Sec Tek, Inc.;[5] and Wackenhut Services, Inc. ("WSI").[6]  *See* AR at 12562-64.

———————————

[2] CIS is a subsidiary of Akal Security, Inc., a privately held company headquartered in Espanola, New Mexico with 15,000 offices in forty-three states and abroad, and annual revenues exceeding $500 million.  *See* AR at 12562; *see also* http://www.manta.com/coms2/dnbcompany_yhv0k.  CIS, headquartered in Lorton, Virginia, is a "major security services company," providing protective services to federal agencies, the U.S. military, and public utilities.  AR at 12562.  At present, CIS provides protective services at the Marshall Space Flight Center and Michoud Assembly Facility.  *Id*.

[3] OMNISEC is a joint venture of [deleted] and [deleted].  *See* AR at 12563.  [Deleted] previously provided services at NASA Headquarters, Stennis, and Johnson Space Centers.  *Id*. [Deleted], headquartered in [deleted], Virginia, has [deleted] employees in [deleted] countries.  *Id*.

[4] Protective Services Alliance is a limited liability company comprised of Day & Zimmerman Federal Services LLC ("D&Z") and Security Operations Consulting – Security Management Group, Inc. ("SOC-SMG") [deleted].  *See* AR at 12563.  D&Z, headquartered in Philadelphia, has over 23,000 employees in 150 locations world-wide.  *Id*.  SOC-SMG, located in Minden, Nevada, also provides force protection and security internationally.  *Id*.

[5] Sec Tek, Inc., headquartered in Reston, Virginia, has been providing security protective services since 1992.  *See* AR at 12564.  Currently, Sec Tek provides security services to NASA's Ames Research Center, Goddard Space Flight Center, and Headquarters.  *Id*.  Previously, these services also were provided to Glenn Research Center.  *Id*.

[6] WSI, a subsidiary of Group 4 Securicor, a U.K. firm, is a private security and investigation firm, headquartered in Palm Beach Gardens, Florida.  *See* AR at 12564.  Founded in 1954, WSI has provided security services to five NASA locations, *i.e.*, Kennedy Space Center, Johnson Space Center, Dryden Flight Research Center, Ames Research Center, and White Sand Testing Facility. *Id*.; *see also* http://en.wikipedia.org/wiki/wackenhut.  In addition, WSI provides fire and security services for the Jet Propulsion Laboratory.  *See* AR at 12564.  In 2002, WSI had $2.8 billion in revenue and operated in fifty-four countries.  *See* http://en.wikipedia.org/wiki/wackenhut.

The following chart shows the SEB's initial evaluation of the proposals for all three factors:

| Offeror | Mission Suitability | | | | | | | | | | Past Perf | Price |
| | Technical Approach | | Management Approach | | Small Business | | Safety and Health | | Overall | | | |
| | Rating | Score | Rating | Score | Rating | Score | Rating | Score | Rating | Score | Rating | $ Billions |
| Coastal | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | $[deleted] |
| Omnisec | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | $[deleted] |
| PSA | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | $[deleted] |
| SecTek | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | $[deleted] |
| Wackenhut | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | $[deleted] |

E = Excellent, V = Very Good, G = Good, F = Fair, P = Poor

*Id.* at 12626.

The following chart compares the price of the Independent Government Cost Estimate ("IGCE") with each of the five preliminary proposals.

| Period | IGCE | COASTAL | PSA | WSI | OMNISEC | SECTEK |
|---|---|---|---|---|---|---|
| Phase-in Basic | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] |
| Sub Total Option | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] | $[deleted] [deleted] |
| Total | $[deleted] | $[deleted] | $[deleted] | $[deleted] | $[deleted] | $[deleted] |

| Ranking Lowest to Highest | | 3 | 5 | 1 | 4 | 2 |
|---|---|---|---|---|---|---|

| Offeror's Price as % of IGCE | | [deleted]% | [deleted]% | [deleted]% | [deleted]% | [deleted]% |
|---|---|---|---|---|---|---|

| Offeror's Price as a Percentage of Competitor's Price | | | | | | |
|---|---|---|---|---|---|---|
| Coastal | [deleted]% | | [deleted]% | [deleted]% | [deleted]% | [deleted]% |
| PSA | [deleted]% | [deleted]% | | [deleted]% | [deleted]% | [deleted]% |
| WSI | [deleted]% | [deleted]% | [deleted]% | | [deleted]% | [deleted]% |
| Omnisec | [deleted]% | [deleted]% | [deleted]% | [deleted]% | | [deleted]% |
| SecTek | [deleted]% | [deleted]% | [deleted]% | [deleted]% | [deleted]% | |

*Id.* at 12624.

13

On February 29, 2008, based on these initial evaluations, the SEB recommended to the SSA that only WSI be included in the "competitive range." *Id*. at 12553.  During an Executive Session with the SSA, however, legal counsel discussed excerpts from prior cases involving competitive range determinations.  *Id.*  Thereafter, the SSA decided against limiting the competitive range only to WSI, because it was in the "Government's interest to continue the competition given [unspecified] weaknesses in [WSI's] proposal."  *Id.* at 12897.  None of the offerors challenged that decision.

On March 3, 2008, the SEB sent letters to WSI and CIS advising them of "weaknesses and necessary clarifications" in their initial proposals.  *Id*. at 26640.  On March 26, 2008 and March 28, 2008, the SEB convened oral discussions with WSI and CIS.  *Id*.  On April 25, 2008, WSI and CIS submitted revised Final Proposals to the SEB.  *Id*. On May 20, 2008, the SEB presented Final Findings to the SSA.  *Id*.

**D.**     **The Source Evaluation Board's Final Determinations.**

**1.**     **The "Mission Suitability" Factor.**

**a.**     **The "Technical Approach" Subfactor.**

Initially, CIS had a "Technical Approach" Subfactor rating of "Good," with [deleted] "significant strengths," [deleted] "regular strengths," [deleted] "significant weakness," and [deleted] "regular weaknesses," with a point score of [deleted].  *See* AR at 12569; *see also* AR at 26433.  After discussions with the SEB, CIS and WSI submitted a revised Final Proposals.  *Id*. at 26640.  CIS received an "Excellent" rating with a point score of [deleted].  *Id*. at 26658.  CIS was assigned [deleted] "significant strengths," [deleted] "significant weaknesses," [deleted] "regular strengths," and [deleted] "regular weaknesses."  *Id*. at 26433.

14

The following chart shows the SEB's Final Evaluation of WSI's and CIS's "significant strengths" regarding the "Technical Approach" Subfactor:

<u>"TECHNICAL APPROACH" SUBFACTOR</u>

|   | WSI | CIS |
|---|-----|-----|
| 1. | Detailed and thorough compliance analysis of NPSC technical requirements | [deleted] |
| 2. | Exceptional response to the 7 technical scenarios contained in the RFP | [deleted] |
| 3. | Effective plan for responding to emergencies and unplanned requirements | |
| 4. | Well-structured and effective professional security training program | |

*Id*. at 26433, 26447.

### b.   The "Management Approach" Subfactor.

Initially, the SEB evaluated CIS's Proposal's "Management Approach" Subfactor as having [deleted] "significant strengths," [deleted] "regular strengths," [deleted] "significant weaknesses" and [deleted] "regular weaknesses." *See* AR at 12570; *see also* AR at 26436. After discussions with the SEB, CIS and WSI submitted revised Final Proposals. *Id*. at 26640. The SEB eliminated CIS's and WSI's "regular weaknesses," but CIS still retained [deleted] "regular weakness." *Id*. at 26436, 26452.

15

The following chart shows the SEB's Final Evaluation of both offeror's "significant strengths" regarding the "Management Approach" Subfactor.

<u>"MANAGEMENT APPROACH" SUBFACTOR</u>

|  | WSI | CIS |
|---|---|---|
| 1. | Comprehensive management approach to program, contract, business and quality management, and customer satisfaction | [deleted] |
| 2. | Approach to recruiting and training of emergency response staff | [deleted] |
| 3. | Thorough phase-in plan | |
| 4. | Detailed description of Integrated Risk Management Approach and Continuous Risk Management Process | |

*Id.* at 26436, 26452.

* * *

The SEB's evaluation of the final revised proposal for the "Mission Suitability" Factor resulted in the following number of strengths and weaknesses for WSI and CIS:

| Mission Suitability Subfactor | WSI | CIS |
|---|---|---|
| Technical Approach | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] |
| Management Approach | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] |
| Small Business | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] |
| Safety and Health | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] | Significant strengths: [deleted]<br>Regular strengths: [deleted]<br>Regular weaknesses: [deleted]<br>Significant weaknesses: [deleted] |

*Id*. at 26433, 26436, 26441-42, 26447, 26452, 26459-60.

2.        The "Past Performance" Factor.

The following chart shows the respective strengths and weaknesses of the "Past Performance" Factor for WSI and CIS:

| WSI | CIS |
|---|---|
| Strengths<br>     Relevant Experience<br>     Recruitment/Retention<br>     Exceeded Expectations<br>     Problem Resolution<br>     High Quality Service<br>     Small Business Goals | Strengths<br>     Relevant Experience<br>     Recruitment/Retention<br>     Exceeded Expectations<br>     Contingency Support |
|  | Weaknesses<br>[Deleted] Poor Performance |

AR at 26504-07, 26513, 26576-83.

CIS's [deleted] weakness was attributed to poor performance by a major subcontractor, [deleted], for [deleted] in a prior [deleted] contract. *Id*. at 26513.

### 3.     The "Price" Factor.

The following chart is a Comparative Analysis of the IGCE with both offerors' price proposals for the Phase-In/Basic Contract term and option for the initial five-year contract term:

| Period | IGCE (ADJ) | COASTAL | WSI |
|---|---|---|---|
| **Phase In** | $[deleted] | $[deleted] | $[deleted] |
| **Basic** | [deleted] | [deleted] | [deleted] |
| **Sub Total** | $[deleted] | $[deleted] | $[deleted] |
| **Option** | [deleted] | [deleted] | [deleted] |
| **Total** | **$[deleted]** | **$1,186,340,333** | **$[deleted]** |

AR at 26185.

The next chart provides a detailed breakout of the phase-in/basic contract term, *i.e.*, years 1-5 and the options period, *i.e.*, years 6-10.

### TOTAL BY YEAR

| NPSC - BASE PERIOD | | |
|---|---|---|
| **Year** | **COASTAL** | **WSI** |
| **Phase In** | $[deleted] | $[deleted][7] |
| 1 | [deleted] | [deleted] |
| 2 | [deleted] | [deleted] |
| 3 | [deleted] | [deleted] |
| 4 | [deleted] | [deleted] |
| 5 | [deleted] | [deleted] |
| **Basic** | **$[deleted]** | **$[deleted]** |
| **Basic/Phase** | **$[deleted]** | **$[deleted]** |
| NPSC - OPTION PERIOD | | |
| **Year** | **COASTAL** | **WSI** |
| 6 | [deleted] | [deleted] |
| 7 | [deleted] | [deleted] |
| 8 | [deleted] | [deleted] |
| 9 | [deleted] | [deleted] |
| 10 | [deleted] | [deleted] |
| **Option** | $[deleted] | $[deleted] |
| **Total** | $    1,186,340,333 | $[deleted] |

*Id*. at 26212.

WSI's total proposed fixed price was $[deleted] billion.  *Id*. at 26479.  CIS's proposed price was $1.186 billion, or [deleted] percent below WSI's price.  *Id*. at 26643.

---

[7] The WSI phase-in price, quoted here as $[deleted], is different from the WSI phase-in price of $[deleted] quoted in the rest of the Administrative Record.  *See* AR at 26185, 26200, 26211.  The court assumes the difference is the result of a typographical error.

4.      **Comparison Of Preliminary And Final Score Evaluation Ratings And Scores.**

The following chart shows the difference between the SEB's Preliminary and Final Findings of both CIS's and WSI's Proposals for all factors and subfactors:

| | CIS | | | | WSI | | | |
|---|---|---|---|---|---|---|---|---|
| | **Preliminary** | | **Final** | | **Preliminary** | | **Final** | |
| | Rating | Sc ore | Rating | Score | Rating | Score | Rating | Sc ore |
| **Mission Suitability** | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| Technical Approach | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| Management Approach | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| Small Business | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| Safety and Health | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| **Past Performance** | Rating | | **Rating** | | Rating | | **Rating** | |
| | [deleted] | | [deleted] | | [deleted] | | [deleted] | |
| **Price** | $ Billions | | **$ Billions** | | $ Billions | | **$ Billions** | |
| | $[deleted] | | **$1.186** | | $[deleted] | | $[deleted] | |

AR at 26658.

E.      **The Source Selection Authority's Evaluation And Award.**

The Administrative Record reflects that on May 20, 2008, the SEB held a briefing session with the SSA, who thereafter determined on that same day:

> With regard to Mission Suitability, the SEB rated both offerors as "[deleted]" overall. In terms of the numerical score, Wackenhut's score was approximately [deleted]% higher than Coastal's.   Neither proposal was found to have any significant weaknesses or deficiencies.

> Looking at the factor Mission Suitability, I recognized the SEB gave Wackenhut a "[deleted]" based on its thorough analysis of the technical approach for all task orders, its excellent response to the technical scenarios, its training program demonstrating a commitment to standardizing a professional NASA-wide training program, and its effective plan for responding to unplanned requirements and emergencies.   Additionally, Wackenhut received the significant strengths for its comprehensive management approach, its exceptional methodology to recruitment, its detailed phase-in plan that exceeded Government expectations, its approach to risk management, and its comprehensive approach to the Safety, Health and

Environmental Program.  I concurred with the SEB's rating of "Very Good," finding Wackenhut had a thorough understanding of all requirements of the RFP and Wackenhut could perform this large contract without incurring any major problems.

Coastal also received a "[deleted]" rating for Mission Suitability based upon its proven method for continuous improvement designed to eliminate waste and inefficiencies to improve overall contract performance and due to its [deleted].  I was particularly impressed with Coastal's continuous improvement plan which is [deleted], helping NASA achieve its goal of innovation, standardization, and efficiency over the life of the contract. Coastal also received significant strengths for its web portal program [deleted].  This [deleted] provides for an [deleted] a high level of confidence in Coastal's quality management of the contract.  Additionally, Coastal received significant strengths for its comprehensive and systemic approach to risk management and its comprehensive Safety, Health and Environmental Program.  I also concurred with the SEB's rating of "[deleted]" given to Coastal for the Mission Suitability factor.

With respect to Past Performance, the SEB rated both offerors as "[deleted]."  The SEB identified [deleted] regular strengths for Wackenhut and identified [deleted] regular strengths and [deleted] regular weakness for Coastal.  Although Wackenhut had a marginal advantage regarding this factor, I concluded both Offerors could perform the contract effectively since both had successfully performed Government contracts directly related to the NPSC.

With respect to Price, I was aware that Coastal's price was more than [deleted]% lower than Wackenhut's price.  I re-evaluated Wackenhut's Mission Suitability proposal to determine whether there were any strengths justifying Wackenhut's higher price.  Even though the Offerors both received a rating of "[deleted]" for the Mission Suitability factor, I believed a trade-off analysis was required since the SEB gave Wackenhut a slightly higher Mission Suitability score and more significant strengths than Coastal.

Assessing the importance of the strengths Offerors received was more revealing to me than the number of strengths each offeror received.  I recognized Coastal had [deleted] with a continuous improvement plan and its integrated web portal. Based upon the value of this [deleted], I found the Mission Suitability proposal from Coastal was basically equal to the Mission Suitability proposal submitted by Wackenhut.  I concluded Coastal's proposal offered a better value to the Government given its proposed price was more than [deleted]% lower than the price Wackenhut proposed while its Mission Suitability and Past Performance proposals were essentially equal to Wackenhut's.

AR at 26642-43.

## II.     PROCEDURAL HISTORY.

### A.     At The General Accounting Office.

On June 10, 2008, WSI filed a protest of the May 20, 2008 award with the General Accounting Office ("GAO").  *See* AR at 26708.  On September 10, 2008, the GAO denied WSI's protest.  *Id*. at 27512.

### B.     At The United States Court Of Federal Claims.

On September 17, 2008, WSI filed in the United States Court of Federal Claims: a Complaint, under seal; a Motion for a Protective Order; a Motion for a Temporary Restraining Order; and Motion for a Preliminary Injunction.  The Complaint was assigned to the undersigned judge.  On September 19, 2008, CIS filed a Motion to Intervene, together with a Brief in Support. On that same date, the court convened a telephone status conference, after which the court entered a Scheduling Order requiring: the Administrative Record to be filed by September 29, 2008; WSI to file any dispositive motions by September 30, 2008; any Government response and cross motion to be filed by October 10, 2008; and WSI's response and any cross motion to be filed by October 17, 2008.

On September 19, 2008, the court also granted WSI's request to file the September 17, 2008 Complaint under seal and CIS's Motion to Intervene.  On September 22, 2008, the court issued a Protective Order, requested by the parties.  On September 29, 2008, the Government filed a 27,510 page Administrative Record, under seal, consisting of 23 volumes of documents.

On September 30, 2008, WSI filed a Motion for Judgment on the Administrative Record, under seal ("Pl. Mot.").  On October 10, 2008, the Government filed a Cross Motion for Judgment and Response, under seal ("Gov't. Resp."), as did CIS ("Int. Resp.").  On October 17, 2008, WSI filed a Response to Defendants' Cross Motion and Reply to Defendants' Response ("Pl. Resp."). On October 24, 2008, the Government and CIS each filed a Final Reply to WSI's October 17, 2008 Response to Defendants' Cross Motion, under seal ("Gov't Reply" and "Int. Reply").

On November 19, 2008, the court held an oral argument ("TR 1-114").  On December 5 and December 8, 2008, the court convened telephone status conferences to discuss remedial issues.

## III.    JURISDICTION.

### A.     Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (Jan. 3, 1996), codified at 28 U.S.C. § 1491 (b) ("ADRA"), authorized the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a

proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The September 17, 2008 post-award bid protest Complaint in this case alleges that NASA violated several provisions of the FAR, as well as the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in awarding the contract to CIS. *See* Complaint ¶¶ 34-35. Accordingly, the September 17, 2008 Complaint recites a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

   **B.     Standing.**

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act, 31 U.S.C. § 3551(2)(A).[8] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). A two-part test is applied to determine whether a protester is an "interested party" *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Distrib. Solutions, Inc.* v. *United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citing *Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.") (citations omitted).

In addition to establishing status as an "interested party," under 28 U.S.C. § 1491(b)(1), a protestor must also show that any alleged errors caused "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original)); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised that "because the question of prejudice

_____

   [8] The term "'interested party' . . . with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also Myers*, 275 F.3d at 1369 ("[S]tanding is a threshold jurisdictional issue[.]") (citations omitted).

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award if the error was corrected. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that it was within the zone of active consideration.") (internal citations omitted) (emphasis and alterations in the original).  Panels of the United States Court of Appeals for the Federal Circuit, however, have taken different approaches regarding the evidence required to satisfy the "substantial chance" test in a bid protest case.  *Compare Info. Tech. & Applications*, 316 F.3d at 1319 (a protestor must establish its "chance of securing the award must not have been insubstantial"), *with Alfa Laval Separation, Inc.* v. *United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (holding that a protester is not required to show that, but for the alleged error, the protester would have been awarded the contract; instead a protester must show there was a 'substantial chance' it would have received the contract but for the alleged error), *and Data Gen. Corp.*, 78 F.3d at 1562-63 (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract.").  The United States Court of Appeals for the Federal Circuit, however, has cautioned against focusing too heavily on these semantic differences: "Rather than engage in verbal gymnastics, however, suffice it to say that *Data General* did not, *as it could not*, replace the 'substantial chance' standard with a more demanding one." *Statistica*, 102 F.3d at 1582 (emphasis added); *see also Myers*, 275 F.3d at 1370 ("[T]he substantial chance rule continues to apply[.]").[9]

Certainly, the question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged.  Moreover, the United States Court of Appeals for the Federal Circuit has held that the issue of prejudice may be dependent upon the type of relief sought by the parties:

In *Impresa* [*Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001),] we considered the standard to be applied where the plaintiff

---

[9] Perhaps, the cause of "verbal gymnastics" surrounding the "substantial chance" test arises because bid protests simply arise in many different procurement contexts. *See, e.g., Myers*, 275 F.3d 1366 (involving a sole-source procurement); *Info Tech. & Applications*, 316 F.3d 1312 (involving a lowest priced, technically acceptable procurement); *United States* v. *Int'l Bus. Machines Corp.*, 892 F.2d 1006 (Fed. Cir. 1999) (involving a sealed bid, lowest price procurement).

claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). []  To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive. . . .  [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers*, 275 F.3d at 1370-71 (emphasis added; citations omitted); *see also Alfa Laval*, 175 F.3d at 1367 ("[T]o establish competitive prejudice, protestor must demonstrate that but for the alleged error, 'there was a substantial chance that [it] would receive an award - *that it was within the zone of active consideration.*'" (citing *Caci, Inc.-Fed.* v. *United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983)) (emphasis added).

       **1.**       **The Plaintiff Has Standing.**

       **a.**       **As An "Interested Party."**

On November 30, 2007, WSI submitted a proposal in response to the September 14, 2007 Solicitation.  *See* AR at 6489.  Four other offerors submitted initial proposals.  *Id.* at 12562-64.  The SSA's May 20, 2008 decision to award this contract to CIS directly affects the economic interests of WSI by denying WSI a significant government contract.  Accordingly, WSI is an "interested party."  *See* 28 U.S.C. § 1491(b)(1); *see also Am. Fed'n Gov't. Employees* v. *United States*, 258 F.3d 1294, 1302 (holding that "standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

       **b.**       **Having Demonstrated A "Substantial Chance" of Being Awarded The Contract.**

In this case, the September 14, 2007 Solicitation was a "competitive negotiated acquisition" to be awarded to the "responsible offeror whose proposal results in the best value to the Government." AR at 1472.  Although five companies submitted proposals, WSI was the only firm, other than CIS, determined to be in the "competitive range."  *Id.* at 12553.  Therefore, WSI has a "substantial chance of being awarded this contract.  *See Bannum*, 404 F.3d at 1346.

Since WSI established that it is an "interested party" and had a "substantial chance" of being awarded the contract, the court has determined that WSI has standing to pursue this bid protest.  *See Myers*, 275 F.3d at 1370 ("To have standing, the plaintiff *need only establish* that it 'could compete for the contract' if the bid process were competitive.") (emphasis added; internal citations omitted).

## 2.      The Intervenor Has Standing.

On September 19, 2008, the court granted CIS's Motion to Intervene, pursuant to Rule 24(a) of the United States Court of Federal Claims, providing in relevant part that:

> On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that the *disposition of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a) (emphasis added); *see also Am. Mar. Transp., Inc.* v. *United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) ("Intervention is proper only to protect those interests which are of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment.") (internal quotations & citations omitted). The United States Court of Appeals for the Federal Circuit has held that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp.*, 870 F.2d at 1561 (citing *Westlands Water Dist.* v. *United States*, 700 F.2d 561, 563 (9th Cir.1983)).

### a.      The Intervenor's Motion Was Timely.

The United States Court of Appeals for the Federal Circuit requires that the trial court evaluate three factors in determining whether an intervention is timely: "(1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted; certain alterations in original).

In this case, CIS filed a Motion To Intervene on September 19, 2008, two days after WSI filed the September 17, 2008 Complaint. No party opposed CIS's Motion to Intervene and the court is unaware of any prejudice to the existing parties or any unusual circumstances that would require CIS to be denied full intervention rights. Therefore, CIS's September 19, 2008 Motion To Intervene was timely.

### b.      The Intervenor Has An Interest Relating To The Transaction At Issue.

In addition, CIS has "an interest relating to the . . . transaction that is the subject of [this] action," because CIS's proposal was determined to be in the "competitive range." *See* RCFC 24(a); *see also* AR at 12553. Therefore, any final judgment in favor of WSI will "impair" CIS's "ability to protect its interest." RCFC 24(a).

   **c.**  **The Intervenor's Interest Cannot Adequately Be Represented By The Parties.**

  The Government cannot adequately represent CIS's interest, as CIS's arguments demonstrate. *See, e.g.*, Int. Resp., Int. Reply.  Accordingly, CIS has satisfied the third element of RCFC 24(a). *See* RCFC 24(a)

## IV. THE GOVERNMENT'S LACHES DEFENSE.

### A. The Government's Argument.

  The Government asserts that WSI's protest is barred by the equitable doctrine of laches. *See* Gov't Resp. at 10.  To establish laches the moving party must show lack of diligence by the party against whom the defense is asserted and prejudice to the party asserting the defense. *See Costello* v. *United States*, 365 U.S. 265, 282 (1961).  In this case, the first part of the *Costello* test has been met, because WIS's protest could have been filed in the United State Court of Federal Claims in the first instance. *See* Gov't Reply at 20.  The "unnecessary filing with GAO delayed this Court's review of the protest by four months." *Id.*  The second part of the test also has been satisfied, because it is the Government that has been prejudiced by the delay in the "commencement and consolidation of the services by the Government's chosen contractor." *Id.* at 12*.*

### B. The Plaintiff's Response.

  The Government has not made the requisite showing for the affirmative defense of laches. *See* Pl. Resp. at 25.  WSI did not unreasonably delay in filing this suit. *Id.*  WSI filed a protest with the GAO five days after receiving a debriefing and then timely filed the protest in the United States Court of Federal Claims within one week of receiving a denial from GAO. *Id.* at 25-26.  There are no extraordinary circumstances present in this case, and the Government has made no specific showing of prejudice. *Id.*

### C. The Court's Resolution.

  The Government's assertion of the equitable defense of laches is unfounded in both fact and law.  The doctrine of laches is "an affirmative defense, equitable in nature, that denies relief to the plaintiff who has unreasonably or inexcusably delayed in asserting a claim." CALVIN W. CORMAN, LIMITATIONS OF ACTIONS § 3.3.2 at 183 (1991) ("CORMAN ON LIMITATIONS").  The United States Court of Appeals for the Federal Circuit has defined laches as "neglect or delay in bringing suit to remedy an alleged wrong, which together with the lapse of time and other considerations, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co.* v. *R.L. Chaiders Const. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (*en banc*).  Although, considerable latitude is granted to the trial court in applying this doctrine, nevertheless, "it must be established that the delay is unreasonable and that it caused prejudice to the defendant." CORMAN ON LIMITATIONS § 3.3.2 at 183 (citing *Foster* v. *United States*, 733 F.2d 88 (Fed. Cir. 1984)).

In this case, the SSA awarded the contract at issue to CIS on May 20, 2008.  *See* AR at 26642-43.  On June 10, 2008, WSI filed a timely protest at the GAO.  *Id*. at 26708.  On September 10, 2008, the GAO denied WSI's protest.  *Id*. at 27512.  Seven days later, on September 17, 2008, WSI filed a timely Complaint in the United States Court of Federal Claims.  Under these circumstances, no facts evidence that WSI delayed asserting claims either in the GAO or this court or that the Government has been prejudiced in any way.  *See Heritage of Am. LLC* v. *United States*, 77 Fed. Cl. 66, 73 (2007) ("Although it has taken time to arrive at this Court, [Plaintiff has] taken every step on its bid protest journey in a timely manner.").  Accordingly, the doctrine of laches is not even remotely implicated in this case and the Government's assertion thereof is unwarranted.  *See* TR at 72-73.

## V.   GOVERNING   PRECEDENT   REGARDING   A   DECISION   ON   THE   ADMINISTRATIVE RECORD IN A BID PROTEST CASE.

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the APA, 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

The United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Galen Med. Assocs.,* 369 F.3d at 1329 (citations omitted); *see also Bannum,* 404 F.3d at 1351 (holding that the trial court initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citation omitted).

A "disappointed bidder" bears a "heavy burden" of showing that an award decision had no rational basis.  *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001).  This burden is even greater when the procurement is a "best value" procurement, as is the case here.  *See Galen Med. Assocs.*, 369 F.3d at 1330 ("As the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp.* v. *Widnall*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurement, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted); *see also John C. Grimberg Co. Inc.* v. *United States*, 702 F.2d 1362, 1372 (holding that the court may interfere with a federal procurement process "only in extremely limited circumstances"). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Impresa*, 238 F.3d at 1332-33 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.") (citation & internal quotations omitted).

The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 52.1,[10] is similar but not identical to a Motion for Summary Judgment, pursuant to RCFC

---

[10] On June 20, 2006, the Clerk of the United States Court of Federal Claims issued changes to the Rules of the United States Court of Federal Claims. In part, the amended rules supplant RCFC 56.1 with a new RCFC 52.1. The new RCFC 52.1(a) makes provisions for the filing of the administrative record in certain cases. *See* RCFC 52.1(a) ("In all cases in which action by, and a record of proceedings before, an agency is relevant to a decision, the administrative record of such proceedings shall be certified by the agency or agencies and filed with the court. The court may by order, including a scheduling order entered pursuant to RCFC 16(b) and Appendix A or C, establish a time for filing the administrative record."). RCFC 52.1(b) permits any party to "move for partial or other judgment on the administrative record" and sets forth the relevant procedures. *See* RCFC 52.1(b) ("The parties may move for partial or other judgment on the administrative record filed with the court. Absent an order by the court setting a different procedure, in any such motion or supporting memorandum, the moving or cross-moving party shall include a Statement of Facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court. The opposing party shall include in any response a Counter-Statement of Facts that similarly draws upon and cites to the administrative record."). The Rules Committee explained the reason for this change:

> RCFC 52.1 has no [Federal Rules of Civil Procedure] counterpart. The rule replaces an earlier rule, RCFC 56.1, that applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed. . . . Specifically, the now repealed Rule 56.1 did *not* adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact. *See* RCFC 56(c). Nonetheless, despite this omission, parties, in moving for judgment on the administrative record under the prior rule, frequently would contest whether the

56. *See Bannum*, 404 F.3d at 1355. The inquiry on a Motion for Summary Judgment is whether the moving party has proven its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* RCFC 56. In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is more limited, *i.e.*, given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record."); *see also* RCFC 52.1.

## VI.   DECISIONS CONTESTED IN THIS BID PROTEST.

### A.   Decisions By The Source Evaluation Board.

#### 1.   The "Mission Suitability" Factor Determinations.

The "Mission Suitability" Factor, including four subfactors and various component elements, was to be considered the most important evaluation factor by the SEB. *See* AR at 1483. First, the SEB was to make an assessment of each proposal's "significant strengths," "regular strengths," "regular weaknesses," and "significant weaknesses." *Id.* at 2611. Next, the SEB was required to designate each proposal with an adjectival rating, followed by a percentage score within that adjectival rating for each "Mission Suitability" Subfactor. *Id.*

In this protest, WSI challenges three of the SEB's "Mission Suitability" Subfactor Determinations. *See* Compl. ¶ 35a-b; *see also* Pl. Mot. at 13-33.[11]

---

administrative record showed the existence of a genuine dispute of material fact. To avoid this confusion, the new rule omits any reference to summary judgment or to the standards applicable to summary judgment.

RCFC 52.1, Rules Comm. Note (June 20, 2006).

[11] During oral argument, WSI conceded and the Government concurred, that WSI's argument contesting a "regular weakness" assigned by the SEB under the "Technical Approach" Subfactor of the "Mission Suitability" Factor was no longer at issue, and because WSI did not plead this claim with specificity and the SSA's Final Decision did not take this "weakness" into consideration. *See* RCFC 7(b)(1) (requiring a complaint to "state with particularity the grounds therefore:); *see also* TR at 10-12, 100.

### a.      The Qualitative Significance Of The Ratings.

The Complaint does not allege that the SEB violated any FAR regulation in failing to consider or assign certain elements of the "Technical Approach" Subfactor and "Management Response" Subfactor of the "Mission Suitability" Factor with more qualitative significance than others, but rather that the SEB's ratings violated the APA, because the ratings were "arbitrary and capricious." *See* Compl. ¶ 35a.

### i.      The Plaintiff's Argument.

WSI's proposal was "clearly superior" in "Mission Suitability," because WSI had [deleted] "significant strengths" but CIS had only [deleted].  *See* Pl. Mot. at 13.  Therefore, "[w]hen the 'significant strengths' held in common are canceled out, what remains are WSI's [deleted] 'significant strengths' under the "Technical Approach" and "Management Approach" Subfactors, compared to [CIS's] [deleted] 'significant strengths' under those Subfactors."  *Id.* at 13-14.  Moreover, the qualitative character of WSI's "significant strengths" was superior to the "significant strengths" of CIS.  *Id*. at 14.

For example, under the Technical Approach Subfactor, the first element, "Understanding the Requirements" has two subparts: "Technical Scenarios" and "General Understanding."  *See* AR at 1474.  WSI received [deleted] "significant strength" under both subparts for "exceptional" response to all seven technical scenarios contained in the RFP and a detailed and thorough compliance analysis of NPSC technical requirements.  *Id*. at 26449.  The second element of the "Technical Approach" Subfactor was "Staffing Plan."  *Id*. at 1474.  Again, WSI received [deleted] "significant strength" for an "effective plan for staffing in response to unplanned requirements and emergencies."  *Id*. at 26451.  Each of these "significant strengths" covered substantial parts of the evaluation criteria.  *See* Pl. Mot. at 14.

In contrast, CIS received [deleted] "significant strength" in [deleted] element of the "Technical Approach" Subfactor for "robust formal continuous improvement program."  AR at 26434.  A continuous improvement plan, however, is just one component of the "General [Understanding]" element, and therefore is "only a very small part of the evaluation criteria in this subfactor."[12]  Pl. Mot. at 15.

_____

[12] The five components of the "General [Understanding]" element [that is one of the two elements of the "Understanding of the Requirements" element of the Technical Approach Subfactor] are:

(1) The Offeror's identified critical work functions to be accomplished[.]

(2) The Offeror's demonstrated understanding of the key contract performance characteristics[.]

Likewise, the qualitative nature of "significant strengths" in the "Management Approach" Subfactor demonstrates WSI's dominance:

> [E]ach of WSI's "significant strengths" is more important than Coastal's [deleted] "significant strength," as measured by the Section M criteria. The first Management Approach subfactor element is "Management Plan." WSI received [deleted] "significant strength" that covered a majority of the criteria in that element: [deleted] "significant strength" for its "comprehensive management approach to program, contract, business and quality management, and customer satisfaction." . . . The second element of the Management Approach subfactor is the Phase-In Plan. WSI's [deleted] "significant strength," its "thorough Phase-In Plan," covers the full range of that second element, and the SEB Chairman himself acknowledged the importance of that significant strength . . [In contrast,] Coastal's [deleted] significant strength for the Management Approach subfactor is its "web portal to [deleted]." A web portal is a management tool and thus fits somewhere within the Management Plan element. It is a very narrow part of the subject matter covered by the "Management Plan" criteria, and it is not a specific requirement stated anywhere in the Solicitation.

*Id*. at 15-16 (internal citations to AR omitted).

SEB's Final Findings assigned WSI the highest rating in the "Technical Approach" Subfactor. *See* AR at 26658. The SEB rated WSI's "Technical Approach" as "[deleted]" and assigned it a score of [deleted] out of [deleted] possible points. *Id*. CIS received a "Very Good" rating, with [deleted] points. *Id*. In addition, WSI's strengths were broad, "covering large swaths of the evaluation criteria" and should receive even more weight than CIS's "narrow strengths." *See* Pl. Mot. at 16. The Government and the CIS "repeatedly fall back on the mantra of agency discretion to defend the actions of [the SEB]" but the agency's actions here cannot be characterized as a legitimate "exercise of discretion." *Id*. at 1-2.

---

(3) *The Offeror's approach to quality management (quality control and quality assurance), including how the offeror will use quality organization processes, procedures*[.]

(4) The Offeror's technical approach to performing the requirements of the PWS and task orders in relation to their proposed labor resource requirements[.]

(5) The Offeror's approach to work management and controls[.]

AR at 1474 (emphasis added).

33

### ii.     The Government's Response.

The Government defends the SEB's ratings as a matter within the agency's discretion.  *See* Gov't Resp. at 17.  In addition, the Government criticizes WSI for characterizing each "significant strength" as indistinguishable and interchangeable, ignoring the fact that the SEB could assign different values to individual "significant strengths."  *See* Gov't Reply at 3.

The Government first takes issue with WSI minimizing the importance of SEB's rating of CIS's continuous improvement plan, an element of the "Understanding the Requirements," "Technical Approach" Subfactor.  *See* Gov't Resp. at 16.  The SEB acted appropriately in recognizing the clear advantages of CIS's continuous improvement plan, finding that the "program ensures that all processes associated with the contract are subject to review and improvement, making it a substantial benefit to the Government."  *Id*. at 17 (citing AR at 26434).

### iii.     The Intervenor's Response.

CIS refutes WSI's emphasis on "significant strengths" as the principal discriminator and the conclusion that, since WSI had more significant strengths, WSI should have been awarded the contract.  *See* Int. Resp. at 9-12.  CIS states that the evaluation system was "not a rigid mechanical process of merely counting up strengths and weaknesses."  *Id*.  If it were, the SSA's overall "best value" determination would be unnecessary.  *Id*. at 9-10.

### iv.     The Court's Resolution.

It is well established that "procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement regulations, particularly in those circumstances where, as here, a negotiated procurement is at issue."  *Day & Zimmerman Servs.* v. *United States*, 38 Fed. Cl. 591, 597 (1997) ); *see also Oceaneering Int'l, Inc.*, 2001 WL 695072, at *10 (Comp. Gen. 2001) ("There is nothing improper with the agency identifying strengths and weaknesses under an adjectival rating scheme, as the agency did here.  Adjectival ratings and point scores are only a guide to assist agencies in evaluating proposals; information on advantages and disadvantages of proposals is the type of information that source selection authorities should have in addition to ratings and point scores to enable them to determine whether and to what extent meaningful differences exist between proposals.  Proposals with the same adjectival ratings are not necessarily of equal quality and the agency may properly consider specific advantages that make one proposal of higher quality than another.") (citations omitted).

Therefore, as a matter of law, the SEB did not abuse its discretion in how "significant strengths," "regular strengths," "significant weaknesses," and "regular weaknesses" were assigned in the overall rating of the "Mission Suitability" Factor.

### b.     The Rating And Scoring Of The "Technical Approach" Subfactor.

The Complaint alleges that the SEB violated the APA by failing to provide a "written explanation" of how final ratings and point scores were assigned and compare with both proposals. *See* Compl. ¶ 35a.  The Complaint also alleges that the SEB violated FAR 15.306(e)(1),[13] in effect, because CIS could not have achieved an increase in the "Technical Approach" Subfactor of [deleted] points between the SEB's Preliminary and Final Findings, changing CIS's rating from "[deleted]" to "[deleted]," without improper input and preferential treatment from the SEB during the discussion period.  *Id*. ¶ 35b.

### i.     The Plaintiff's Argument.

WSI argues that the "Technical Approach" Subfactor rating and scoring was arbitrary and capricious, because the SEB "failed to rationally reflect the difference in quality between [WSI's] and [CIS's] proposals." Pl. Mot. at 17.  WSI's "Technical Approach" Subfactor proposal received three "significant strengths," compared to CIS's one "significant strength."  *Id*.  The SEB, however, rated the WSI and CIS proposals [deleted]% and [deleted]% respectively.  *Id*.  Since the adjectival ratings require "at least one 'significant strength' to achieve a rating above 70%," WSI asserts that it "makes no sense for [CIS's] score to increase from [deleted]% to [deleted]%[,] based [only] on [deleted] 'significant strengths,' while [WSI's] score increased only [deleted] percentage points more to [deleted]% based on [deleted] 'significant strengths.'"  *Id*. at 17-18.  The "irrational closeness of these scores is more questionable," because the SEB "*did not document in any fashion how it arrived at the scores*."  *Id*. at 18 (emphasis added).

Although WSI recognizes that the SEB has some discretion, "[t]he exercise of that judgment . . . does not, as [the Government] would have it, make the numbers of significant strengths irrelevant."  *See* Pl. Resp. at 19.  In fact, WSI's "significant strengths" were broader than what was required in the Solicitation and any "nuancing" in favor of CIS is inconsistent with the evaluation criteria.  *Id*. at 21.

### ii.     The Government's Response.

The Government responds that WSI's "attempt to rewrite the evaluation plan . . . by reducing the evaluation process to a simple mathematical exercise is misleading."   Gov't Resp. at 23.  Regarding the allegation that the SEB did not document how the "Technical Approach" Subfactor

---

[13] FAR 15.306(e)(1) provides:

Limits on exchanges.  Government personnel involved in the acquisition shall not engage in conduct that – favors one offeror over another.

48 C.F.R. § 15.306(e)(1).

scores were determined, the Government explained that following the SEB's identification of strengths and weaknesses, point scores were determined by "consensus deliberation following definitions set forth in the RFP." *Id*. at 24.  Therefore, "[t]his process, by its nature, required that subjective judgment calls be made at every step, and is not susceptible to mathematical reverse engineering." *Id*.

In addition, the Government disputes WSI's claim that the decision-making process was arbitrary and capricious, because under the terms of the Solicitation, the SEB was not required to perform a comparison.  *Id*.  That was the SSA's job.  *Id*.  Although significant strengths are a "discriminating factor . . . significant strengths" alone "do not account for the final scores." *Id*.  WSI had more "significant strengths" than CIS, but WSI also had six weaknesses compared to CIS's two weaknesses.  *See* Gov't Reply at 18.

### iii.    The Intervenor's Response.

WSI "cannot identify any way in which the SEB's evaluation was inconsistent with the criteria set forth in the [S]olicitation and the Source Selection Plan . . . As long as an agency's evaluation was reasonable, consistent with the stated evaluation scheme, and in compliance with applicable statutes and regulations, it should be upheld."  *See* Int. Resp. at 13.

WSI's argument that the SEB failed to document how it reached the assigned scores is also "unpersuasive." *Id*. at 14.  The SEB's conclusions adequately are documented, because "[g]iven the voluminous record, there should be no difficulty in determining the basis upon which award was made." *Id*.  Likewise, WSI's criticism that the SEB failed to conduct a comparative assessment of the two proposals, reflects a misunderstanding of the evaluation process. *Id*.  Neither the procedures nor the evaluation criteria set forth in the Solicitation requires a comparative analysis. *Id*.  Moreover, if WSI "believed that a comparative assessment of the proposals [was] required by law and/or regulation, [WSI] should have protested on that basis prior to the date for receipt of proposals." *Id*.  At this juncture, however, WSI cannot challenge the process used to determined the rating and scoring of the "Technical Approach" Subfactor. *Id*.

### iv.    The Court's Resolution.

There is no evidence in the Administrative Record, or otherwise, that the SEB overtly favored CIS over WSI in violation of FAR 15.306(e)(1)[14] or provided CIS with any information about WSI's Proposal, or otherwise coached CIS to make any of the changes or improvements reflected in CIS's

---

[14] *Supra* note 13.

Final Proposal.  *See* FAR 15.306(e)(2)-(5);[15] *see also Kalvar Corp.* v. *United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1301-02 (1976) (holding that government officials are presumed to act in good faith). Particularly in negotiated procurements, as is the case here, the agency is afforded broad discretion in conducting discussions with the offerors to determine the offer most advantageous to the government.  48 C.F.R. § 15.306(d)(2);[16] *see also Lockheed Missiles & Space Co.* v. *Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) ("[A]gencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'") (quoting *Tidewater Management Services, Inc.* v. *United States*, 573 F.2d 65, 73, 216 Cl. Ct. 69 (1978).  Requiring the SEB to address and suggest corrections for each proposal's individual weakness "would saddle an onerous obligation on the contracting agency; namely to shift the task of proposal writing from the private contractor

---

[15] FAR 15.306(e)(2)-(5) provides:

(e) Limits on exchanges. Government personnel involved in the acquisition shall not engage in conduct that--

    (2) Reveals an offeror's technical solution, including unique technology, innovative and unique uses of commercial items, or any information that would compromise an offeror's intellectual property to another offeror;

    (3) Reveals an offerors price without that offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion. It is also permissible, at the Government's discretion, to indicate to all offerors the cost or price that the Government's price analysis, market research, and other reviews have identified as reasonable (41 U.S.C. 423(h)(1)(2));

    (4) Reveals the names of individuals providing reference information about an offeror's past performance; or

    (5) Knowingly furnishes source selection information in violation of 3.104 and 41 U.S.C. 423(h)(1)(2).

48 C.F.R. 15.306(e)(2)-(5).

[16] FAR 306(d)(2). states:

The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the Solicitation.

48 C.F.R. § 306(d)(2).

to the government agency." *Westech International, Inc.* v. *United States*, 79 Fed. Cl. 272, 290 (2007) (quotations omitted); *see also Labat-Anderson, Inc.* v. *United States*, 42 Fed. Cl. 806, 835 (1999) ("[A]gencies are not obligated to conduct all encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.").

On the other hand, as the United States Supreme Court restated in *Florida Power & Light* v. *Lorion*, 470 U.S. 729 (1985), "The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision *based on the record* the agency presents to the reviewing court[.]" *Id*. at 743-44 (emphasis added).

In this case, the Administrative Record includes thirty-seven SEB Preliminary Worksheets, evaluating CIS's Initial Proposal under the "Technical Approach" Subfactor. *See* AR at 12204-40. The Administrative Record, however, includes only thirteen SEB Final Worksheets, evaluating CIS's Final Proposal under the "Technical Approach" Subfactor. *Id*. at 26359-71.[17]

Of the thirty-seven Preliminary Worksheets, only two included changes. *Compare* AR at 12216 *with* AR at 26363 (Security Training Program); *also compare* AR at 12234 *with* AR at 26368 (Center Canine Training and Operations). In addition, three categories that were not included in CIS's Initial Proposal received a Final Evaluation, *i.e.*, AR at 26359 (Quality Assurance Organizational Structure); AR at 26360 (Formal Continuous Process Improvement); and AR at 26371 (Cross Training Fire and Security Personnel).[18] As a result of these changes, the Administrative Record shows that CIS's point score increased from [deleted] points to [deleted] points, *i.e.*, by [deleted]% between the SEB's Preliminary Findings and the SEB's Final Findings. *See* AR at 26658.

Specifically, two SEB Preliminary Worksheets were changed in the Final Worksheets, *i.e.*, the Security Training Program element and the Center Canine Training and Operations element. As to the Security Training Program element, the Preliminary Worksheet states that:

The proposal describes a complete training approach [deleted].

*Id*. at 26363.

--------

[17] The court assumes that the absence of 24 of the SEB Final Evaluations from the Administrative Record reflects that no changes were made from the Preliminary Worksheets.

[18] The Solicitation clearly invited and confirmed that "any proposed enhancements to the contract requirements under the Mission Suitability subfactor" would be evaluated, if the "Offeror agrees to include proposed enhancements . . . in the final contract." AR at 1473. Therefore, the SEB violated no law nor FAR regulation in reviewing CIS's "proposed enhancements" in the final evaluation process.

In addition to those assessments, the Final Worksheet also states that:

The offeror has provided *additional detailed information* regarding their proposed approach to security training. The proposed approach gives clear evidence of a thorough understanding of NASA's training requirements. The proposal is both innovative and comprehensive in the following ways:
- •     [deleted].

*Id.* (emphasis added).

The Administrative Record, however, contains no discussion or analysis of *how the SEB's decision to increase CIS's Security Training Program rating from a "strength" to a "significant strength" affected CIS's point score for this element and the amount of any score increase. Id.; see also* TR at 62-63.

As for the Preliminary Worksheet for the Center Canine Training and Operations element, it states that:

[deleted]

*Id.* at 12234.

In contrast to the Security Training Program element, the Center Canine Training and Operations element initially was not rated. *Id.* In the Final Worksheet, however, the SEB rated the Center Canine Training and Operations element as a "regular strength," because:

[deleted]

AR at 26368.

Again, the Administrative Record contains no discussion or analysis of *how the SEB's decision to accord CIS's "Technical Approach" Subfactor a "regular strength" rating affected CIS's point score for this element and the amount of any score increase. Id.; see also* TR at 62-66.

In addition, as previously discussed, CIS appropriately addressed three additional elements in the Final Proposal, not required by the Solicitation. First, under the "Technical Approach" overall element, CIS proposed:

[deleted]

AR at 26359.

39

This new addition to CIS's proposal was considered a "regular strength," but the Administrative Record contains no discussion or analysis of *how this rating affected CIS's "Technical Approach" Subfactor point score and the amount of any score increase. Id*.; *see also* TR at 62-66.

Second, CIS's Final Proposal, also proposed:

[deleted]

AR at 26360 (emphasis added).

Again, this new addition to CIS's Final Proposal was considered a "significant strength." *Id*.[19]  The Administrative Record, however, contains no discussion nor analysis of *how this rating affected CIS's "Technical Approach" Subfactor point score and any score increase. Id*.; *see also* TR at 62-66.  More importantly, the SEB improperly attributed "[deleted]" benefits of the new "continuous improvement program" element to the "Technical Approach" Subfactor, contrary to the Solicitation, that includes only four subfactors, [deleted].  *See* AR at 2610.  Moreover, as the Government touted, CIS's proposed [deleted] was particularly influential in the SEB's increased rating and point score increase for the "Technical Approach" Subfactor, as it was estimated to be "[deleted] over WSI."  *See* Gov't Resp. at 17.  The FAR, however, considers such "[deleted]" savings to be a matter of "price."[20]  *See* AR at 26360 (citing FAR Clause 1852.216-83).

The SEB's point scores are entitled to deference, but only if the underlying decisions properly are explained in the Administrative Record.  *See*, *e.g.*, *Femme Comp, Inc.* v *United States*, 83 Fed. Cl. 704, 768 (2008) (need for adequate agency documentation); *210 Earll, L.L.C.* v. *United States*, 77 Fed. Cl. 710, 720 (2006) (holding that an agency is required "to provide 'a coherent and reasonable explanation of its exercise of discretion[.]'") (citation omitted); *Opti-Lite Optical*, 99-1 C.P.D. ¶ 61, 1999 WL 152145, at *3 (1999) ("While adjectival ratings and point scores are useful as guides to decision-making, they generally are not controlling, but rather must be supported by documentation of the relative differences between the proposals, their strengths, weaknesses and risks, and the *basis and reasons* for the . . . decision.") (emphasis added); *see also* Ralph C. Nash & John Cibinic, "Source Selection: A Variety Of Agency Guidance," 3 No. 8 Nash & Cibinic Rep.

---

[19] In addition, the Administrative Record does not discuss the extent of [deleted] involvement in this contract and why [deleted] proposed work was considered to be positive development, in light of prior issues concerning [deleted] controversial subcontractor performance on a different federal government contract.  *Compare* AR at 26360 *with* AR at 26513.

[20] As the FAR [deleted].

[deleted]

48 C.F.R. [deleted] (emphasis added).

¶ 60 (August, 1989) at 4 ("There is a slow trend toward conferring a significant amount of discretion on source selection officials. This is exhibited by the number of documents prohibiting numerical scoring of certain factors and the *requirement in most of them that evaluators prepare substantial narrative justification for the scores the give.*") (emphasis added).

In this case, the court has determined that the SEB violated the APA by failing to create a record to explain and justify the [deleted] increase in point score, or [deleted]% increase, between the SEB's Preliminary and Final Findings as to CIS's "Technical Approach" Subfactor, so that the court can determine whether the SEB acted in an arbitrary and capricious manner. *See Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and *articulate a satisfactory explanation for its action and the choice made* . . . In reviewing that explanation, we must consider whether the decision . . . *was based on a consideration of the relevant factors and whether there has been a clear error of judgment*.") (emphasis added).

As the court observed during oral argument:

THE COURT:        Here's where I have my problem, one of my problems with this record. I was extraordinarily impressed with the amount of detail in the record but for two significant places.

One is under the mission suitability factor. When they began the technical evaluation CIS's score was [deleted], and it popped up to [deleted], moving it up to an [deleted] rating. There is not a word in any of these worksheets that justifies why that increase happened. Not a word.

It's in stark comparison to other places in the evaluation where, and this is different in terms of the -- there are other places where they talk about what happened during the discussion[.]

There are other places where they actually go and do that analysis, but not in this technical area where the scores jump so dramatically. You would expect if any place they would do it it would be here.

So I have no basis in the record, from what I can see, to decide whether that jump in score, which was significant in terms of who received the contract, whether what they did was rational or not because there's no explanation. All we have is the scores.

It's fine that they were done by consensus. It's fine. I mean, the Plaintiff didn't make this argument directly unfortunately, but to me it's the most compelling problem with this entire record. You can see how it changes. In other areas they do that. In this area, nothing.

So it makes we wonder what in the world happened? How did they get all those additional points and increase their rating, and why was none of that discussed?

Okay. Now, we have the same problem, but to a lesser extent, in the small business factor score.[21] When they began their score was [deleted]. They end up with [deleted].

They get a [deleted] [point] increase in their rating, and yet when you look at the evaluation sheets of those areas -- there's only one evaluation sheet, by the way, on that -- not one word about why the scores change and based on what.

So I don't have an ability to say based on this record that what they did was appropriate on those two areas. That also, I might add, was never pointed out by the Plaintiff, but to me those two flaws alone, aside from whatever else he's been arguing, are really fatal.

Those SEB problems are fatal to the bid protest because of their significance in how the overall rating was presented to the source selection authority. Do you see?

TR at 62-64.

---

[21] The Administrative Record also evidences that five elements of the "Small Business" Subfactor were rated. *See* AR at 12198-202. Only two elements reflected changes between the Preliminary and Final Worksheets. *Compare* AR at 12202 *with* AR at 26357; *compare also* AR at 12202 *with* AR at 26356. CIS's "Small Business" rating was increased from "[deleted]" to a final rating of "[deleted]." *See* AR at 26658. CIS's point score increased from [deleted] to [deleted] points or a [deleted]% increase, based on a change from a "Significant Weakness" to a "Significant Strength." *Compare* AR at 12202 *with* AR at 26357. The "Small Business Goal" element also was increased from a "Significant Weakness" to a "Regular Weakness." *Compare* AR at 12201 *with* AR at 26356. WSI's Complaint does not allege any claim as to the SEB's Evaluation of the "Small Business" Subfactor of the "Mission Suitability" Factor, however, the court has determined that the same deficiencies identified with regard to other aspects of the "Mission Suitability" Factor are applicable to this Subfactor. *See* TR at 63-64, 71.

* * *

THE COURT:        You know, my problem basically is to take a look and do my job appropriately, and when I come to some area you just can't say oh, well.  We rely on the Agency's discretion and I wave a magic wand over the whole thing.  If [so], there's no reason for me to be involved.

The Administrative Procedures Act, what [it] tell[s] an Agency [is] . . . you [have] a lot of deference, but you've got to tell [the public] why you [made a decision].  That's what I'm missing in this area, in this important area.

You didn't . . . [explain] why those scores jumped so significantly in that area and in the small business area, and that's what made the difference in the ratings.

TR at 65-66.

* * *

THE COURT:        [T]his was the most fulsome evaluation I've seen, but what stands in contrast is these two critical areas I looked at where the score bumps up.  That's where it falls apart.

You have to wonder why was that?  They just got sloppy in those two particular areas, or they didn't want to explain what happened or it really didn't happen?  That there really was no justification for it?

See, because they were so careful in all the other areas where the score goes up they're silent about what happens, and that's why it stands out in contrast.

TR at 79.

In addition, any increase in the "Technical Approach" Subfactor point score attributed to the [deleted] discussed above violated FAR [deleted], since [deleted] should have been considered as a "[deleted]" Factor.  *See* TR at 101-03.

43

c.      The Scoring And Rating Of The "Management Approach" Subfactor.

The Complaint alleges that the SEB "acting arbitrarily and capriciously, and treated the offerors unequally in rescoring [CIS's] proposal for the Management Approach Subfactor disproportionately to the rescoring of WSI's proposal for the Technical Approach Subfactor." Compl. ¶ 35b.

i.      The Plaintiff's Argument.

WSI argues that the point scoring and rating of the "Management Approach" Subfactor, like the "Technical Approach" Subfactor, was arbitrary and capricious, since the SEB:

did not document how it arrived at these scores, anymore than it did for the Technical Approach subfactor[,] however, unlike like the Technical Approach subfactor[,] this scoring was arbitrary[,] for a different reason – namely, that the SEB treated [CIS] more favorably than WSI with regard to the same evaluation adjustment.

Pl. Mot. at 25.

Under the "Management Approach" Subfactor, WSI initially received a rating of "[deleted]" and a point score of [deleted] out of [deleted] possible points. *See* AR at 26658. On the other hand, CIS received an initial "[deleted]" rating and a [deleted] point score. *Id*. In addition, the SEB initially assigned both CIS and WSI a "regular weakness" for their respective labor relations plans. *Id*. at 26436, 26452; *see also* Pl. Mot. at 25. After further discussions, the SEB eliminated that weakness for both offerors, resulting in an increase to WSI's point score from [deleted] to [deleted]; however, CIS's score increased from [deleted] to [deleted]. *See* AR at 26658. WSI argues that "[b]ased on this disparity, [CIS's] weighted score increased by [[deleted]] points, [but] WSI's weighted score increased by only [[deleted]] points, dramatically affecting the total scoring results." Pl. Mot. at 25. The SEB explained that the difference also was the result of the SEB's "increased . . . appreciation for [CIS's] web portal." *Id*. CIS's web portal, however, previously was identified as a "significant strength" and therefore the SEB's additional [deleted]% point score increase was improper. *Id*. at 25-26. In short, the SEB's scoring WSI only a [deleted]% over CIS, despite WSI's [deleted] "significant strengths" was "arbitrary and capricious." *Id*. at 26. Moreover, the fact that SEB did not document *how* the rating and point scoring of the "Management Approach" Subfactor was determined violated the APA. *Id*. at 25.

In addition, CIS's "[deleted] significant strength for the Management Approach Subfactor was a 'web portal to [deleted].'" *Id*.; *see also* AR at 26437. A web portal, however, is a management tool, "and thus fits somewhere within the Management Plan element." Pl. Mot. at 16.[22]

_____

[22] Moreover, as the Bragg Declaration explains, WSI and CIS both [deleted].

44

### ii.     The Government's Response.

The Government responds that although WSI argued that the web portal was a "very narrow part of the subject matter covered by the Management Plan criteria," the SEB considered it a very significant aspect of CIS's proposal: "[deleted]." AR at 26437. The significance that the SEB placed on CIS's web portal was within the agency's discretion. *See* Gov't Resp. at 21. As for the post-award Declaration of Thomas Bragg in the GAO proceeding that there was [deleted], that Declaration should be afforded no weight, since it was irrelevant in the final award decision. *Id.* at 19-20. Moreover, the fact that CIS's proposed [deleted] was ample reason for the SEB to rate this element as a "significant strength," while declining to give WSI an equivalent rating. *Id.* at 21.

WSI incorrectly assumes that the overall subfactor rating is a strict mathematical addition of all the "significant strengths" minus the "significant weaknesses." *See* Gov't Reply at 19. Rather, the SEB views the factor as a whole and assigns a final percentage.

### iii.     The Intervenor's Response.

CIS refutes WSI's arguments that the scoring of the "Management Approach" Subfactor was not documented, because the process followed by the SEB was consistent with the RFP and the Source Evaluation Plan. *See* Int. Resp. at 14.[23] In addition, CIS challenges WSI's insistence that the SEB evaluation was required to be "more technical, with each significant strength, strength, weakness[,] and significant weakness allotted a certain number of points so that one could merely do some basic addition and come up with a clear winner. This is simply not the nature of NASA's evaluation process." *Id.* at 24. CIS responds that there] "*is nothing objectionable about the evaluation process*, followed by the [SEB] here, or the documentation of the evaluation." *Id.* (emphasis added). WSI's argument that CIS was treated more favorably ignores the fact that the SEB did not engage in a comparative evaluation of the two proposals. *Id.* ("Given that each proposal was evaluated separately, it is not unreasonable that adjustments made to each of the proposals following discussions, which were reflected in the final proposals, did not result in identical adjustments to the scores assigned to the proposals."). Therefore, WSI's arguments are nothing more

---

[23] As the Contracting Officer testified at the GAO hearing:

> The SEB voting members assessed each Mission Suitability finding presented by the Committees and reached consensus on the finding type, the wording of each finding, and significance of each finding. Once the findings were complete, the Voting Members reached consensus on the Adjectival Rating for each Mission Suitability subfactor. Once adjectival ratings were assigned, consensus was then reached on a percentage rating for each subfactor within the range established for each adjectival rating. The percentage was then multiplied by the number of points available for each subfactor to arrive at the numerical score.

AR at 27382.

than "mere disagreement" with the evaluation process, scoring methodology, and are unsupported by the record. *Id.*

#### iv.    The Court's Resolution.

For the reasons previously discussed, the court has determined that the SEB violated the APA by failing to create a record to explain and justify the [deleted] point score increase or [deleted]% increase between the SEB's Preliminary and Final Findings as to CIS's "Management Approach" Subfactor so that the court can determine whether the SEB acted in an arbitrary and capricious manner. *See infra.*

### 2.    The "Past Performance" Factor Determination.

The Complaint alleges that the SEB violated FAR 15.305(a)[24] in rating the "Past Performance" Factor. *See* Compl. ¶ 35c.

#### a.    The Plaintiff's Argument.

The SEB rated both WSI and CIS's proposals "[deleted]" under the "Past Performance" Factor. *See* Pl. Mot. at 26. WSI argues, however, that it should have received a higher rating, based on a "huge difference in relevant experience between the two offerors," because "[n]inety-eight percent of the value of [this] contract consists of security services, fire fighting/prevention services, and emergency medical response services." *Id.* (citing AR at 2626-28). WSI listed six contract references of such work, including five with NASA. *Id.* at 27-28.[25] CIS, however, "has no

---

[24] The court assumes this citation is a typographical error, as the relevant FAR regulation applicable to the "Past Performance" Evaluation is FAR 15.305(a)(2).

[25] The six contracts referenced by WSI are:

**The NASA Kennedy Space Center and Cape Canaveral Air Force Station**. WSI provides consolidated and interoperable fire and security services to NASA's Kennedy Space Center (KSC) and Cape Canaveral Air Force Station (CCAFS) as a minority partner in Space Gateway Support, Inc. (SGS), a joint venture (JV) between Northrop Grumman and WSI. Specifically, WSI provides key mission support functions for both NASA and the U.S. Air Force (USAF) to include security guard services, fire protection/prevention, emergency medical services and armed security. WSI also operates the KSC/Cape Canaveral Disaster Preparedness Control Center, a 9/11 Joint Communication Center (JCC) and incident response command facility.

AR at 20072-73.

**The Jet Propulsion Laboratory**. As a subcontractor to the California Institute of

46

experience in performing fire fighting and emergency medical response services, much less experience in performing those functions plus security services in an integrated fashion under a

---

Technology since 1998, WSI has provided NASA "consolidated security, fire protection, and emergency medical services" at the Jet Propulsion Laboratory in Pasadena, California.

*Id*. at 20073-74.

**The Johnson Space Center/White Sands Test Facility**. As a subcontractor, WSI has been providing security services to NASA at these facilities since 2002.

*Id*. at 20075-76.

**The NASA Ames Research Center**. At this facility, WSI has been providing fire fighting/prevention and emergency medical services since August 2006.

*Id*. at 20076-77.

**The NASA Dryden Flight Research Center**. At this facility, WSI has been providing security services since 2004.

*Id*. at 20077-78.

**The Department of Energy Savannah River Site.** This is an extremely large DOE security services contract that WSI has been performing since 1999. It includes a paramilitary protective force of approximately [deleted] armed personnel protecting a 310 square mile site.

*Id*. at 20078-79.

47

single contract."[26]  *Id.* at 28.  In fact, because CIS [deleted]."  *Id.* at 29.  [Deleted], however, is a small subcontractor with limited experience.[27]  *Id.*  The SEB also provided no explanation of why

---

[26] WSI lists the following as CIS's contract references:

**[Deleted]**.  CIS has provided security services to [deleted] since 2001.  Beginning in May 2007, [deleted] into that contract, pursuant to which [CIS] provides security services and a "fire brigade."  (A fire brigade is not a professional fire fighting force, but rather a group of individuals trained to provide interim assistance until a fire fighting force arrives at the scene.)

AR at 14131-32.

**[Deleted]**.  [CIS] has provided security services through four contracts for the [deleted], and the [deleted] in the [deleted].

*Id.* at 14134-35.

**[Deleted]**.  [CIS] lists three contracts under which it has provided security services to the [deleted], and [deleted].

*Id.*  at 14135.

**[Deleted]**. [CIS] has provided security services to [deleted] in this region since 2003.

*Id.*  at 14136.

[27] WSI summarizes [deleted]'s experience as follows:

[deleted]

AR at 14140-41.


[deleted]

*Id.* at 14141.

[deleted]

*Id.* at 14141-42.

[deleted]

WSI's experience did not garner an "[deleted]" rating, but CIS's received a "[deleted]" rating. *Id.* at 30.

WSI further challenges the SEB's "[deleted]" ratings of both proposals, because they do not correlate to the SEB's assigned strengths and weaknesses for the two proposals. *Id.* at 31. The SEB found WSI's proposal had [deleted] strengths but [deleted] weaknesses, compared to CIS's [deleted] strengths and [deleted]. *Id.* CIS's "[deleted]" rating also ignores CIS's [deleted] and [deleted] WSI's strengths. *Id.* at 31-32. CIS could not have received a "[deleted]" rating, unless the [deleted] was ignored, since a "[deleted]" rating "requires that an offeror show past performance with 'only minor problems with little identifiable effect on overall performance.'" *Id.* at 31 (citing AR at 1481). CIS's [deleted] was attributed to the poor performance of a subcontractor:

[deleted]

AR at 26513.

For these reasons, WSI asserts that "[deleted] problem cannot realistically be characterized as 'minor,'" and the overall difference in the strengths and weaknesses assigned to both proposals cannot rationally yield the same adjectival rating. *See* Pl. Mot. at 33. Only WSI had experience [deleted]. *See* Pl. Resp. at 5 (citing AR at 20072-73). Overall "WSI has consolidated and integrated 98% of NASA's solicited services across two geographical locations under one contract." *Id.* at 6. Therefore, although WSI did not have experience consolidating services across fourteen locations, "a standard no one can meet," WSI's past experience "fits squarely within . . . what 'highly relevant' experience should be." *Id.* Given the "total disconnect" between the assigned strengths and weaknesses and the ultimate adjectival ratings, the SEB acted arbitrarily and capriciously. *Id.* at 9.

### b.    The Government's Response.

The Solicitation defines "Past Performance" as "how well an Offeror performed on earlier work." AR at 1480. "How well" is a qualitative judgment, that is not based on the number of contracts performed, but instead whether the services provided met the services required. *See* Gov't Resp. at 35-37.

WSI received [deleted] "regular strengths" and [deleted] weakness, while CIS received [deleted] "regular strengths" and [deleted] "regular weakness." *Id.* at 36. Both proposals were rated "[deleted]" under the "Past Performance" Factor. *Id.* Although these adjective ratings necessarily

---

*Id.* at 14142.

[deleted]

*Id.*

are subjective, the agency should be given flexibility in rating and evaluating different aspects of an offer. *Id*. at 36-37.

Moreover, the Administrative Record does not support WSI's assertion that it has a "far higher degree of relevant experience." Gov't Reply. at 5. The Government contests WSI's claim of having contracts covering "multiple geographic locations," because the Kennedy Space Center and Cape Canaveral are adjacent to one another, not at separate geographic locations. *Id*. at 6. Since the Solicitation involved facilities across the entire country, the SEB was justified in determining that WSI had very relevant, but not highly relevant "Past Experience," thus earning only a "[deleted]," not an "[deleted]" rating. *Id.*

As for [deleted], the SEB determined that [deleted] past performance did not raise a significant problem affecting CIS's overall performance regarding this Solicitation. *Id*. at 7. Under the Source Selection criteria, an offeror could still attain a "[deleted]" rating, if an assigned "weakness" would have "only little identifiable effect on overall performance." AR at 26681. Therefore, the SEB was well within its discretion in deciding that [deleted] deficiencies only had a minimal effect on CIS's "[deleted]" rating. *See* Gov't Reply at 7.

In addition, CIS's past performance is consistent with the SEB's "[deleted]" rating. *Id*. Specifically, CIS's multi-location, multi-service [deleted], providing fire emergency and security services, is more relevant than WSI's Kennedy Space Center/Cape Canaveral contract. *Id*. Moreover, thirty-three "Past Performance" questionnaires[28] rated CIS's performance on other government contracts. *Id*. at 8. Sixty-six percent of those questionnaires, rated CIS's performance as excellent (vs. a 57% rating WSI), and in 84% of the questionnaires, CIS was rated either as "Excellent" or "Very Good." *Id*.

### c.     The Intervenor's Response.

CIS responds that the SEB's evaluation of WSI and CIS's past performance is a matter within the discretion of the agency and the court cannot substitute its judgment, where the agency's decision was "reasonably based." Int. Resp. at 25. In this case, the SEB carefully considered the past performance of both offerors. *Id*. at 26. Because the SEB had a rational basis for assigning both WSI and CIS a "[deleted]" rating for the "Past Performance" Factor, WSI has no basis to contest this determination. *Id*. at 28.

Moreover, despite WSI's claims to the contrary, CIS has experience consolidating multiple services, such as fire and security services in multiple geographic locations. *See* Int. Reply at 18.

---

[28] During oral argument, the Government corrected this statement, because only sixteen questionnaires were sent. *See* TR at 77.

### d.       The Court's Resolution.

FAR 15.304(c)(3)(i) requires that an evaluation of past performance be conducted "in all source selections for negotiated competitive acquisitions expected to exceed" $1,000,000, unless the agency determines this is not a relevant evaluation factor in light of the particular procurement.  *See* 48 C.F.R. § 15.304(c)(3)(i).  In this case, past performance was considered a relevant factor.  *See* AR at 2611-12.  Broad discretion, however, is afforded an agency's analysis of "Past Performance" Evaluations.  *See Gulf Group Inc.* v. *United States*, 61 Fed. Cl. 338, 351 (2004) (when reviewing an agency's "Past Performance" Evaluation, the court should accord, "the greatest deference possible . . . to the agency); *see also JWK Int'l Corp.* v. *United States*, 52 Fed. Cl. 650, 659 (2002) (court review of agency "evaluations of an offeror's . . . past performance . . . should be limited to determining whether the evaluation was  reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements.").

In light of the fact that there was no change in the SEB's Preliminary and Final Findings as to the rating of either proposal, both of which were perceived to be "[deleted]," WSI's argument that it was entitled to a higher rating is not supported in fact or law.[29]  *See In re Technical & Admin. Servs. Corp.*, 1998 U.S. Comp. Gen. LEXIS 320, 98-2 Comp. Gen. Proc. Dec. 85, at 3, Comp. Gen. B-279828, July 24, 1998 (a protestor's "mere disagreement with the agency's evaluation is not itself sufficient to establish that the evaluation was unreasonable.").  In addition, the court has determined that the SEB did not violate FAR 15.305(a)(2)[30] in conducting the "Past Performance" Evaluation.

---

[29] During oral argument, WSI's counsel also pointed out additional errors in the SEB's understanding of how "Past Performance" references were submitted and what appears to be a mistake by one of the SEB evaluators.  *See* TR at 41-62, 66-67, 77-78.  The court does not consider any of these errors to be determinative, particularly given that the final ratings for both offerors were the same.

[30] FAR 15.305(a)(2), governing the "Past Performance" Evaluation provides:

   (i) Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information is separate from the responsibility determination required under Subpart 9.1.

   (ii) The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror's

*See ABF Freight Sys., Inc.* v. *United States*, 55 Fed. Cl. 392, 409 (2003) ("Mere differences of opinion regarding the handling of a procurement matter are insufficient to support allegation or irrationality with supporting evidence.").

**B.      The Decisions Of The Source Selection Authority.**

On May 20, 2008, the SEB forwarded a Final Evaluation to the SSA, discussing each proposal's adjectival ratings and point scores for the "Mission Suitability," "Past Performance," and "Price" Factors and conducted a SSA Final Decision Briefing. *See* AR at 26644, 26657-58. The SSA was required to review the SEB Final Findings and "select the . . . proposal [that] is the best value to the Government." AR at 2604 (citing FAR 15.303(a)(b)).

---

corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror's past performance. The source selection authority shall determine the relevance of similar past performance information.

(iii) The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.

(iv) In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.

(v) The evaluation should include the past performance of offerors in complying with subcontracting plan goals for small disadvantaged business (SDB) concerns (see Subpart 19.7), monetary targets for SDB participation (see 19.1202), and notifications submitted under 19.1202-4(b).

48 C.F.R. § 15.305(a)(2).

### 1.      The "Mission Suitability" Factor Determination.

The Complaint alleged that the SSA violated FAR 15.308,[31] and acted arbitrarily and capriciously in: (i) determining that WSI's and CIS's final proposals as to the "Mission Suitability" Factor and "Past Performance" Factor were "'basically equal;" (ii) in failing "to provide any discussion in [the] selection decision of the value of WSI's significant strengths; and (iii) in failing "to conduct a technical/price tradeoff between [WSI's] significant strengths and WSI's 5% higher price." Compl. ¶ 35d.

### a.      The Plaintiff's Argument.

WSI argues that the SSA's conclusions under the "Mission Suitability" Factor were flawed for four reasons. *See* Pl. Resp. at 12-25. First, the SSA's decision under both the "Technical Approach" Subfactor and the "Management Approach" Subfactor reveals a misunderstanding of critical facts. *Id*. at 13-16. The SSA found that CIS's "[deleted]" for a continuous improvement process counterbalanced WSI's [deleted] under this Subfactor. *Id*. at 14. Although WSI also had a continuous improvement process, the SSA incorrectly believed that WSI's ended after the transition phase. *Id*.; *see also* TR at 17-23.[32]

_____

[31] FAR 15.308 provides:

The source selection authority's (SSA) decision shall be based on a *comparative assessment of proposals against all source selection criteria* in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's *independent judgment*. The source selection decision shall be documented, and the documentation shall include the *rationale for any business judgments and tradeoffs made or relied on by the SSA*, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (emphasis added).

[32] Again, the SSA testified at the GAO hearing:

GAO HEARING OFFICER:   And in terms of the continuous improvement plan, did the SEB tell you, do you recall, whether WSI had a continuous improvement plan?

SSA:                                  Yes.

GAO HEARING OFFICER:   So you were aware of that?

SSA:                                  Yes. But it was pertaining to the startup or the initial

Likewise, the SSA improperly concluded that CIS's web portal was so superior as to offset WSI's [deleted].  *See* Pl. Resp. at 14; *see also* TR at 25-30.  Again, WSI argues this decision was sufficiently grounded on "critical factual misunderstandings."  Pl. Resp. at 14.[33]  Both offerors proposed the same [deleted].  *Id.*

Second, the SSA mistakenly concluded that "WSI's proposal demonstrated [deleted] significant strengths compared to only [deleted] for [CIS]."  *Id.* at 16.  The SSA had discretion to consider the "significant strengths" of each offeror's proposal and apply his judgment, but he had to do so consistently with the evaluation criteria.  *Id.* at 16-17.  In that regard, the SSA also ignored the fact that WSI's "significant strengths" covered more areas of the evaluation criteria than CIS's narrower "significant strengths."  *Id.* at 17.

Third, "[e]ven if the [c]ourt believed that the [SSA's "Mission Suitability"] finding of equality was not *per se* arbitrary and capricious, the result is sufficiently counter-intuitive to require a full explanation by the SSA that permits the [c]ourt to prove the reasonableness of that decision."  *Id.*  The SSA addressed only CIS's [deleted] unique "significant strengths," but failed to address WSI's [deleted] unique "significant strengths."  *Id.* at 18.  The SSA never discussed how he

---

|  | phase-in plan, not for the life of the contract. It was only pertaining to the phase-in plan of the contract. It stopped short of the life of the contract. It was not a continuous process. |
|---|---|
| GAO HEARING OFFICER: | So you understood that WSI's proposed continuous improvement plan would not actually be in effect for the actual performance of the contract, is that right? |
| SSA: | Correct. |

AR at 27470.

[33] As the SSA further testified at the GAO:

| GAO HEARING OFFICER: | What was it about [CIS's] significant strengths with web portal and this continuous improvement process that were so important to you? |
|---|---|
| SSA: | Well, the web portal is a way of managing the contract and what [CIS] demonstrated to me through the SEB in my briefing was their web portal [deleted]. |

AR at 27462.

determined WSI's strengths had no more value than CIS's.  *Id*.  The absence of any discussion by the SSA about how he evaluated these strengths is determinative.  *Id*.

Finally, WSI refutes the Government's argument that WSI misperceives the SSA's job as "quantitative" rather than "qualitative."  *Id*. at 18.  The evaluation process begins with the assignment of strengths and weaknesses.  *Id*. at 18-19.  Those strengths and weaknesses are translated into adjectival ratings and numerical scores.  *Id*. at 19.  WSI admits that the evaluation process is qualitative, however, "[i]f the evaluation process is to mean anything, then a proposal that has more significant strengths than another proposal (all other strengths and weaknesses being equal) is presumptively a better proposal."  *Id*.  The SSA "cannot just ignore the fact that an Outstanding [] rating is quantitatively stronger than a Good [] rating or the fact that [a proposal] assigned seven significant strengths is quantitatively stronger than [a proposal] that receives four strengths altogether, only two of which are significant strengths."  *Id*. at 19-20 (quoting *Femme Comp.*, 88 Fed. Cl. at 770).

### b.    The Government's Response.

The Government disputes that WSI's web portal software was of a similar quality to CIS.  *See* Gov't Resp. at 19.  Although WSI proffered the Bragg Declaration to establish that [deleted]," his opinion should be afforded no weight, because it was prepared months after the award and was not available to either the SEB or SSA at the time of the Final Decision.  *Id*.  In fact, the superiority of CIS' web portal [deleted].  *Id*. at 20.  In contrast, WSI's web portal [deleted].  *Id*. at 21.  Given the relative importance of the web portal in the Solicitation, coupled with CIS's superior offering, the SSA's decision regarding "Technical Approach" Subfactor was not arbitrary and capricious.  *Id*.

Moreover, the court cannot decide this case based on an Administrative Record, different than that before the agency.  *See* Gov't Reply at 13.  WSI failed to show that the Bragg Declaration satisfies the requirements of Rule 702 of the Federal Rules of Evidence, because it does not assist the court "to understand the evidence or to determine a fact in issue."  *Id*. at 14.

### c.    The Intervenor's Response.

CIS takes issue with WSI's statement that the SSA never saw demonstrations of the offerors' web portals.  *See* Int. Reply at 5.  CIS argues that it would have been "inappropriate for the SSA to have been at the demonstrations of the web portal[,]" because at that point in the evaluation process, "it was the responsibility of the SEB to evaluate the material presented by the offerors."  *Id*.  At the briefing of the SSA, "the superiority of [CIS's] web portal was extensively documented as a significant strength with respect to [CIS's] Mission Suitability evaluation[.]" *Id*.  In contrast, WSI's web portal was not considered a "strength."  *Id*. at 6.  In short, the SSA "was provided with all of the information necessary in order to draw his own conclusions concerning the capabilities offered by each offeror's respective web portals."  *Id*.  Moreover, [deleted].  *Id*. at 7.  The SEB cannot be faulted for being "so impressed by [CIS's] [deleted], and so [deleted], and [deleted]."  *Id*. at 9.

CIS also objects to the Bragg Declaration, as it "simply seeks to inject [] extraneous materials into the proceedings that WSI chose not to submit to [the SEB] at the time when it conducted a thorough vetting of the two proposed portal proposals[.]" *Id*. at 10. Both offerors should be evaluated based on their submitted proposals and demonstrations before the SEB, "not the suppositions and speculation of a paid expert hired for this post-award protest litigation." *Id*. at 12.

The Administrative Record shows that the SSA spent approximately three hours privately reviewing the evaluation results and was briefed by the SEB on the final results of the evaluation and asked the SEB Chair questions. *See* Int. Resp. at 28-29 (citing AR at 27451-52). In addition, the SSA's decision was consistent with the Solicitation's evaluation criteria, because "his job was not merely to count up the number of strengths and weaknesses of each offeror and award according to a mathematical equation." *Id*. at 31. The SSA has "vast technical knowledge as a result of his duties and his involvement in prior acquisitions" and properly exercised his discretion in making a "best value" determination. *Id*. The SSA "thoroughly considered the technical aspects of both proposals before reaching the conclusion that any advantage [WSI] offered . . . did not warrant payment of an additional [deleted] dollars." *Id*. at 31-32.

Since the SSA has broad discretion in a "best value" procurement, the technical/price tradeoff decision should be examined only to ascertain if it was reasonable and adequately justified, in light of the RFP's evaluation scheme. *Id*. at 33-34. This discretion allows the SSA to award the contract to a lower-priced, lower technically-rated proposal, if the SSA determines that the price premium involved in selecting the higher-rated proposal is not justified given the acceptable level of technical competence available at the lower cost. *Id*. at 34. Moreover, it was not unreasonable for the SSA to select CIS's Final Proposal, where "the competing bidders have extremely close technical ratings, separated by a mere [[deleted]] points on a 1,000 point scale, and the lower [deleted] less than the other." *Id*. Accordingly, the SSA properly and rationally selected CIS's proposal as the "best value." *Id*.

### d.    The Court's Resolution.

In *Cubic Applications, Inc*. v. *United States*, 37 Fed. Cl. 339 (1997), the United States Court of Federal Claims addressed the limited circumstances under which the Administrative Record may be supplemented:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a

failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id*. at 342 (citing *Esch* v. *Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).

In this case, the Government's post-award, post-GAO decision correction conceding that the SEB misunderstood the nature of WSI's continuous improvement process, a fact on which the SSA relied, falls squarely within the fifth *Cubic Applications* exception, and properly should be considered part of the Administrative Record in this case, particularly since the SSA placed a great deal of weight on CIS's continuous improvement plan. *See* Gov't Resp. at 38; *see also* AR at 26642-43; TR at 22-23.

On the other hand, the Bragg Declaration does not fit within any of the *Cubic Applications* exceptions, nor does it satisfy the requirements of Fed. R. Evid. 702,[34] since the court did not have an opportunity to examine Mr. Bragg's *bona fides* nor did the Government and CIS have an opportunity to cross examine the assumed facts on which Mr. Bragg based his opinion. Accordingly, the court declines to include the Bragg Declaration as part of the Administrative Record. *See* TR at 34-35. Since the parties have quoted from or cited the Bragg Declaration in their arguments, selected portions have been included herein in footnotes, but none of the court's determinations have considered or relied on the Bragg Declaration. The same is also true for the testimony proffered by the parties from the GAO proceeding. *See* TR at 35-36.

Now, to the merits. The SSA was responsible for making a Final Source Selection Decision awarding the contract to the "responsible Offeror whose proposal results in the *best value* to the Government." AR at 1472 (emphasis added). The SSA compared the SEB Final Findings regarding both the WSI and CIS proposals. *Id*. at 26642-43. The SSA, however, mistakenly afforded more weight to CIS's "continuous improvement plan," than WSI's similar plan. *Id*. at 26642, 26434. Accordingly, the court has determined that the SSA's resulting conclusion that the "Mission Suitability" Factor between WSI's and CIS's proposals "was basically equal," *ipso facto* was "arbitrary and capricious." In contrast, the SSA's conclusion that, although WSI had a "marginal advantage" as to the "Past Performance" Factor, WSI and CIS "could perform the contract

---

[34] Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

effectively since both had successfully performed Government contracts directly related to the NPSC" was supported by the Administrative Record.  *Id*. at 26643.

The SSA's dispositive error,[35] however, was that the SSA determined that "a trade-off

---

[35] Although this was not a factor in the court's determination that the SSA violated the APA, the compressed period of reflection and analysis, either reflects that this high value procurement did not receive appropriate attention by the SSA or the SEB's "Final Findings" were not a completely "independent" recommendation, incorporating the prior views of the SSA.

As the court observed at the oral argument:

THE COURT:        So [the SEB has] a meeting with the SSA and he pops this opinion out in a day, so there couldn't have been a lot of discussion, unless there was something on the record that we don't know about.

Speaking of which, in the SSA's opinion he says at the beginning: "In addition, *I solicited and considered the views of key senior personnel at NASA and Center representatives during the executive session about the SEB's presentation.*"

GOV'T COUNSEL:    I'm not sure of the answer to that, your Honor.

TR at 76; *see also* 78-80 (emphasis added).

The answer appears to be in the record of the GAO proceedings.

HEARING OFFICER:  Did you interact with the SEB during the acquisition process?

SSA:              Yes, I did.

HEARING OFFICER:  Can you describe this interaction?

SSA:              Well, the SEB actually was located at Kennedy Space Center. We had our own building down there and *I would talk to the SEB chair and several of the staff on a regular basis several times a week telephonically. And I made trips down there at least once or twice a month, certainly every month and a half over the period of a year and a half that this took place.*

HEARING OFFICER:  Were there any form of briefings by the SEB to you?

SSA:              Yes.

59

analysis was required, since the SEB gave [WSI] a slightly higher Mission Suitability score and more significant strength than [CIS]," yet the SSA's Final Source Selection Decision contains absolutely no discussion about the relevant factors of that trade-off analysis.  *See* AR at 26643; *see also Serco,*

| | |
|---|---|
| HEARING OFFICER: | Can you describe those? |
| SSA: | Well, they're basically status updates, starting off in the early days of procedural and how we were going to proceed, establishing procedures, guidelines, authorities and then, *as it went on, just getting updates on issues that were developing and just various updates*. |

                                    *   *   *

| | |
|---|---|
| HEARING OFFICER: | Were you also briefed by the SEB on the final results of the evaluation? |
| SSA: | I was, the next day, the 20th. |
| HEARING OFFICER: | Is it fair to say you had a good understanding of all of the evaluation findings? |
| SSA: | Yes. |

AR at 27451-52 (emphasis added).

Although the court is not aware of a FAR provision that prohibits the SSA from having discussions with the SEB during their evaluation, the problem that arises is how much influence did the SSA have in shaping the SEB's ratings and point scores during the critical period between the Initial and Final Findings.  *See supra* at 43-44 (quoting TR at 62-64).  In this case, the Administrative Record shows that the SSA rejected the SEB's initial competitive range determination.  *See* AR at 12553, 12897.  The Administrative Record does not reflect the nature and extent of the communications between the SSA and SEB during the SEB Final Findings.  The Administrative Record, however, reflects that the same day that the SEB Final Briefing occurred, the SSA's Decision was rendered.  *See* AR at 26421, 26643.  The Administrative Record also reflects that the SSA noted in the SSA's Final Source Selection Decision that he "solicited and considered the views of key senior personnel at NASA and center representatives during the executive session about the SEB's presentation," but did not mention his extensive communication with the SEB prior to that time.  *Compare* AR at 26642-43 *with* AR at 27451-52.

Therefore, although WSI did not raise this issue, it *appears* that the SSA *may have influenced* the SEB to increase CIS's scores and ratings during the Final Evaluation period, so that the SSA's "best value" decision already was reflected in the SEB's Final Findings.

*Inc.* v *United States*, 81 Fed. Cl. 463, 497 (2008) (holding that "generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions.").

As the court observed during oral argument:

> THE COURT:    There's no technical tradeoff whatsoever in that document. It just wasn't done. [The SSA] may have [done] it in his mind, but he's got to write it down, you see[.]

TR at 65.

*   *   *

> As I said before, the [SSA]'s decision is not adequate either. He didn't even make an attempt to discuss the tradeoff. He said I thought one was needed. End of sentence. And so what was [the SSA's] tradeoff?

TR at 74-75.

### 2.    The "Past Performance" Factor Determination.

The Complaint alleges that the SSA acted "arbitrarily and capriciously, and abused his discretion," by concluding that the two proposals were equal for the "Past Performance" Factor, "despite the differences in strengths and weaknesses assigned by the SEB." Compl. ¶ 35d.

### a.    The Plaintiff's Argument.

WSI argues that the SSA perpetuated the SEB's errors in determining the "Past Performance" Factor. *See* Pl. Mot. at 36. The SEB's rating of "Very Good" for both proposals misled the SSA to believe that WSI's additional strengths amounted only to a "marginal advantage." *Id.* (citing AR at 26643). Moreover, the SSA did not "attempt to distinguish between the degree of relevance of each company's experience." *Id.*[36] Therefore, because the SSA relied on the SEB's error in the "Past Performance" rating, the SSA's decision, taking away WSI's "deserved advantage in the Past Performance factor," was arbitrary and capricious. *Id.* at 36-37.

Moreover, the SSA acted arbitrarily and capriciously in concluding that the two offerors' proposals were equal under the "Past Performance" Factor. *See* Pl. Resp. at 11. The SSA failed to

---

[36] In the GAO proceedings, the SSA also testified, in response to a question as to whether the SSA distinguished between the experience of the two offerors: "Well, I'm making an assumption and hopefully it's a valid one that the SEB took into consideration. I didn't go into that granularity." AR at 27473.

account for the difference in experience between WSI and CIS and the difference in the quality of performance. *Id*. Overall, the SSA's "justification for treating the proposals as equal for this factor was . . . no more than an empty recitation that was contrary to fact and devoid of serious analysis." *Id*. at 12.

### b.    The Government's Response.

The Government responds that WSI merely "rehashes its earlier argument relating to the Past Performance, . . . [f]or reasons previously discussed, the 'very good' rating received by [CIS] was justified, and the SSA did not act in an arbitrary and capricious manner by concluding that WSI only had a marginal advantage in Past Performance as compared to [CIS]." Gov't Resp. at 39.

The SEB was correct in assigning CIS a "[deleted]" rating under the "Past Performance" Factor, and the SSA did not act arbitrarily in treating the competing proposals for "Past Performance" as basically equal. *See* Gov't Reply at 8-10.

### c.    The Intervenor's Response.

CIS responds that NASA fully considered [deleted] past performance and how it would affect CIS's "Past Performance" Factor rating overall. *See* Int. Reply at 17. Moreover, the SSA reasonably determined that [deleted] would have only a limited role in the performance of the contract and prior problems with the Air Force contract were irrelevant. *Id*.

### d.    The Court's Resolution.

The Complaint alleges no FAR violation regarding the SSA's evaluation of the SEB's "Past Performance" Factor, however, the Complaint alleges that the SSA acted "arbitrarily and capriciously and abused his discretion" by inappropriately relying on the SEB Final Findings. *See* Compl. ¶ 35(e). For the reasons previously discussed, the court discerns no error in the SEB's "Past Performance" Factor analysis, nor in the SSA's apparent reliance thereon.

### 3.    The "Price" Factor Determination.

The SSA's Final Source Selection Decision concluded: "[CIS's] proposal offered a better value to the Government given its proposed price was more than [deleted]% lower than the price [WSI] proposed while its Mission Suitability and Past Performance proposals were essentially equal to [WSI]." AR at 26643. Although WSI did not challenge the SSA's "Price" Factor determination, in reviewing the Administrative Record the court noticed that the Meeting Minutes for the SSA Final Decision Briefing reflected that the last item of business was the Chair of the Business Committee, PS-SEB, Contracting Officer requested "authorization to include, as part of modification 1, an increase in the contract's [Not-To-Exceed] amounts to $[deleted] [million] for the Base and

$[deleted] for each option year. Bill McNally[37] gave his permission to increase the [Not-To-Exceed] amounts in the contracts."  AR at 26421.  The minutes reflect that the SSA then met with "his Executive Advisors" and awarded the contract to CIS.  *Id.*

The Source Evaluation Plan provides:

**B.8     INDEFINITE   DELIVER   INDEFINITE   QUANTITY   (IDIQ)   - LIMITATIONS**

(a)     For the purpose of placing a maximum Not-To-Exceed (NTE) amount on this contract, the maximum amount of IDIQ supplies and services ordered in total under this contract shall not exceed the maximum NTE amount of **$650M for the five year basic period of performance and $130M per option year for a total NTE maximum amount of $1.3B**.  The maximum NTE amount is an estimate and does not reflect an obligation of the Government.  The Government's obligation hereunder shall be based on that specified in the task orders issued during the effective ordering period for this contract as depicted in Clause F.2 – Effective Ordering Period.

(c)     In order to accommodate upward fluctuations of workload requirements during the performance period of this contract, the maximum NTE amount may be adjusted unilaterally by the Contracting Officer on an annual basis.  *In no event, will the adjusted maximum amount exceed **20%** of the total $1.3B NTE maximum amount.*

AR at 12 (bold and underline in original, other emphasis added).

Although the Contracting Officer had authority to adjust the NTE amount as set forth in the Source Evaluation Plan, there is not one word of explanation or analysis in the Administrative Record of why a $[deleted] million increase was required for the base period, *i.e.*, years 1-5, much less an additional $[deleted] million for the option periods, *i.e.*, years 6-10.  The need to increase the NTE at this juncture is particularly troublesome to the court, since the price of CIS's phase-in for years 1-5, did not exceed the $650 NTE set forth in the Source Evaluation Plan.  *Compare* AR at 26212 *with* AR at 12.  Moreover, NASA estimated that CIS's "continuous improvement program" potentially could be worth as much as $[deleted] billion, if all the options are exercised.  *See* Gov't Resp. at 17; *see also* AR at 12.  Therefore, the May 20, 2008 increase of the NTE amount from $[deleted] million to $[deleted] million, at least for the phase-in and base period, *i.e.*, years 1-5, appears to be unwarranted, "arbitrary[,] and capricious."

---

[37]  Bill McNally is the Assistant Administrator, Office of Procurement.  *See* http://www.nasa.gov/about/highlights/mcnally_bio.html.  Mr. McNally was not an initial member of the Source Evaluation Board.  *See* AR at 2603.  Nor was he mentioned anywhere else in the Administrative Record.  He was, however, in attendance at the May 20, 2008 SSA Final Decision Briefing.  *See* AR at 26421.  The court assumes he was present in an Ex-Officio capacity.  *See* AR 2605.

Moreover, it appears from the Administrative Record, that CIS's award for the phase-in and base period, *i.e.*, years 1-5, of $[deleted] could be increased by $[deleted] for a total of $[deleted], in which case, CIS could receive $[deleted] more for the phase-in and base period than WSI's bid.

## VII.   PLAINTIFF HAS ESTABLISHED PREJUDICE.

In addition to establishing a violation of the law or a regulation, a protestor must also show that the violation caused the protestor prejudice.  *See Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."); *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'") (citations omitted).  A claim on the merits of a bid protest will only succeed if both requirements are satisfied.  *See Bannum*, 404 F.3d at 1351; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)).  Prejudice, in this context, requires the protestor to show a "substantial chance" that it would have received the contract award, but for the APA error.  *See Bannum*, 404 F.3d at 1358 ("To establish prejudice, Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."); *see also Metcalf Constr. Co.* v. *United States*, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e.*, *harmless errors*, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision.") (emphasis added).

In this case, because WSI was the only other bidder determined to be in the competitive range, but for the award to CIS, WSI likely would have been awarded the contract.  *See* AR at 12553, 12897.  This is particularly the case, where WSI's "Mission Suitability" Factor final score was [deleted] out of a total 1,000 possible points, WSI's "Past Performance" Factor of "[deleted]" was the same as CIS, and these two Factors combined were "significantly more important than the "Price" Factor in awarding the contract.  *See* AR at 1483, 26658.

## VIII.   PLAINTIFF IS ENTITLED TO LIMITED INJUNCTIVE RELIEF.

### A.   Governing Precedent Regarding Relief In Bid Protest Cases.

As a matter of law, the United States Court of Federal Claims in a bid protest case has authority:

> (2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief[,] except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

28 U.S.C. §§ 1491(b)(2), (3); *see also LABAT-Anderson, Inc.* v. *United States*, 65 Fed. Cl. 570, 576 (2005) ("Title 28 U.S.C. § 1491(b)(2) authorizes this court to 'award any relief that the court considers proper, including declaratory and injunctive relief.'"); *Labat-Anderson*, 42 Fed. Cl. at 832 ("The court has jurisdiction over this bid protest action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), which grants it authority to render judgment upon claims for breach of an implied contract to have bids and proposals 'fairly and honestly considered.'")(citation omitted).

The United States Court of Appeals for the Federal Circuit, however, has held that the court is not required to set aside an arbitrary, capricious, or otherwise unlawful contract award. *See PGBA, LLC* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("We thus hold that, in a bid protest action, [28 U.S.C. §] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). On the other hand, the United States Court of Appeals for the Federal Circuit reasoned, "there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA." *Id.* at 1227; *see also id.* at 1226 ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the United States Court of Federal Claims with discretion in fashioning relief."). Accordingly, procurement error does not necessarily require the trial court to order equitable relief, but to decide instead *whether* to issue the injunction. *Id.* at 1228-29 (emphasis added).

In deciding whether to issue an injunction the court must consider:

(1) whether, . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *See Amoco Prod. Co.* v. *Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 [] (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

*Id*.

None of these individual factors, however, is determinative and "the weakness of . . . one factor may be overborne by the strength of others." *FMC Corp.* v. *United States*, 3 F.3d 424, 472 (Fed. Cir. 1993).

**B.     The Relief Requested In This Case.**

The Complaint requests that the court:

A.     Find and declare that the Government has acted arbitrarily and capriciously, abused its discretion, and acted contrary to law in its evaluation procedures and in awarding the contract to [CIS];

B.     Enter . . . preliminary and permanent injunctions, to require the Government to (i) stay the performance of [CIS's] contract, and (ii) to correct the evaluation errors determined in this action and then to make a proper award decision after a technical/price tradeoff, in accordance with the Solicitation's award criteria, to determine whether WSI's great proposal strengths are worth a [deleted]% price differential.

C.     Award WSI's costs incurred in this action, and

D.     Provide such other and further relief as the Court [deems] just and proper.

Compl. ¶ 42.

**C.     The Court's Resolution.**

**1.     Plaintiff Has Demonstrated Success On The Merits Regarding Specific Issues.**

For the court to award equitable relief, a protester must have prevailed on the merits.  *See PGBA*, 389 F.3d at 1229.  In this case, as previously discussed herein, the court has determined that the SEB and SSA have violated the APA, and certain FAR regulations, demonstrating success on the merits.

**2.     Plaintiff Has Established Irreparable Harm, If The Court Does Not Grant Injunctive Relief.**

The second substantive consideration is whether the protester will suffer irreparable harm, if the court does not grant injunctive relief.  *See PGBA*, 389 F.3d at 1229.  When assessing irreparable injury, the relevant inquiry is whether the protester has an adequate remedy, in the absence of an injunction.  *See OTI Am., Inc.*, 68 Fed. Cl. 646, 659 (2005) (quoting *PGBA, LLC* v. *United States*, 60 Fed. Cl. at 221, *aff'd*, 389 F.3d 1219 (2004)).  The United States Court of Federal Claims has held that a protester suffers irreparable injury, when it has been deprived the opportunity to compete fairly for a contract. *See Cardinal Maint. Serv., Inc.* v. *United States*, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders. . . .  Irreparable injury includes, but is not limited to, lost profits which would flow from the contract." (citing *Hunt Bldg. Co.,*

*Ltd.* v. *United States*, 61 Fed. Cl. 243, 280 (2004) ("[The awardee,] will be harmed by having to undergo a recompetition-but not as severely as [, the losing bidder,] would be, if the unfair selection were allowed to stand." The awardee "will still be able to compete, [but] this time on equal footing with . . . whereas absent injunctive relief, [the losing bidder] will have been unfairly denied a meaningful opportunity to compete. On balance, injunctive relief is warranted to remedy the unfair process here.")); *see also SAI Indus.* v. *United States*, 60 Fed. Cl. 731, 747 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'" (quoting *Metcalf Constr. Co., Inc.* v. *United States*, 53 Fed. Cl. 617, 645 (2002))).

In this case, the Government has awarded a $1.186 billion contract for a ten-year term that may be extended to ten years in total at a potential cost of $1.62 billion. *See* AR at 12, 26421, 26638, 26708. The Administrative Record, however, does not provide the court with sufficient information to quantify the potential profit each offeror could earn during the term of this contract. WSI, however, has committed substantial resources to challenge the procurement in the GAO and the United States Court of Federal Claims. Therefore, unless WSI is afforded limited injunctive relief, WSI will be deprived of the opportunity to compete fairly and equally for this very significant contract.

> **3.     In This Case, A Balance Of Hardships To The Parties Favors The Grant Of Limited Injunctive Relief.**

The third substantive consideration is whether the balance of hardships to the respective parties favors a grant of injunctive relief. *See PGBA*, 389 F.3d at 1229. To be sure, a limited injunction requiring NASA to reevaluate the offerors' proposals in accordance with APA requirements and applicable FAR regulations will impose some additional time and expense on the agency. On the other hand, during this post-award bid protest NASA's existing protective services will remain in operation. Moreover, NASA has not indicated to the court that a limited delay in awarding the contract might threaten the continued operation of the agency's function. The court does not have sufficient information to ascertain any specific hardship that CIS would suffer, but it is clear that, absent an award of limited injunctive relief, WSI would lose the opportunity to compete on a fair basis for this contract.

Given the minimal impact of limited injunctive relief on NASA, the balance of the hardships favors the grant of injunctive relief. The minimal additional time and expense involved in requiring NASA to have members of the SEB re-evaluate key elements of the "Mission Suitability" Factor and "Price" Factor and for the new SSA re-evaluate the SEB's reconsidered Final Findings to select the proposal that is the "best value" to the Government is outweighed by the importance of allowing WSI the opportunity to compete fairly for this contract.

4.      **In This Case, The Public Interest Weighs in Favor of Limited Injunctive Relief.**

The final consideration is whether it is in the public interest to grant injunctive relief.  *See PGBA*, 389 F.3d at 1229.  It has long been recognized that the public interest is served by an injunction that is designed to ensure that the procurement process is conducted pursuant to law.  *See LABAT-Anderson*, 65 Fed. Cl. at 581 ("[T]here is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations.") (citations omitted); *see also SAI Indus.*, 60 Fed. Cl. at 747 ("The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts.  Healthy competition ensures that the costs to the taxpayer will be minimized.  In addition, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations."); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L.* v. *United States*, 56 Fed. Cl. 502, 521 (2003) ("[T]he public interest is served by enforcing a procurement process that conforms with regulatory authority and the solicitation's evaluation criteria." (citing *Essex Electro Eng'rs, Inc.* v. *United States*, 3 Cl. Ct. 277, 288 (1983))).

Therefore, the court has determined that a limited injunction directing NASA to reexamine the Proposals submitted in response to the Solicitation and comply with the terms of the Solicitation, the APA and relevant provisions of the FAR is in the public interest.  *See TRW Envtl. Safety Sys, Inc.* v. *United States*, 18 Cl. Ct. 33, 43 (1989) ("As a general proposition, while a contracting officer may exercise wide discretion in his evaluation of bids and in the application of procurement regulations, particularly in negotiated procurements, the ultimate obligation of the agency is to treat all bidders fairly and give full consideration to all bids.").

## IX.     CONCLUSION.

For the reasons discussed herein, the court has determined that the SEB and SSA violated FAR regulations and the APA.  Accordingly, the SSA's May 20, 2008 award of a contract to CIS, pursuant to the September 14, 2007 FPP NO. NNX077040R Solicitation, is enjoined and set aside. NASA is hereby ordered to appoint a re-constructed SEB, specifically to include new SEB members to evaluate the Final "Technical Approach" Subfactor, "Management Approach" Subfactor, and "Small Business" Subfactor of the "Mission Suitability" Factor, with particular emphasis on explaining the SEB's reasons for arriving at final adjectival ratings, point scores, and any increase thereof.  The SEB will then issue reconsidered Final Findings.  In addition, NASA is hereby ordered to appoint a new SSA to evaluate the reconsidered Final Findings and, on or before March 2, 2009, to issue a reconsidered Source Selection Authority Final Decision explaining, in detail, the SSA's reasons for determining whether WSI's or CIS's proposal provides the "best value" to the Government.  The Government also is ordered to provide the court with a copy of this reconsidered Source Selection Authority's Final Decision.

The court emphasizes that NASA is expected to correct the FAR and APA violations, discussed herein, and to address the court's concern that the SEB's reconsidered Final Findings reflect the SEB's *independent* evaluation and that the SSA's reconsidered Final Source Selection

Decision reflect the SSA's *independent and considered judgment* as to the proposal that provides the "best value" to the Government.  In addition, to the extent that the Contracting Officer, SEB, and/or SSA again determines that the NTE must be increased at this time, in excess of the provisions of Section B.8(a),(c) of the Source Evaluation Plan, the court orders that a comprehensive explanation and analysis be included in the Source Selection Authority's Final Decision provided to the court.


        **IT IS SO ORDERED.**

                                    _____ s/ Susan G. Braden _____
                                       **SUSAN G. BRADEN**
                                       **Judge**